In re APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER PERMITTING CHRISTEN SVEAAS TO TAKE DISCOVERY FROM DOMINIQUE LEVY, L & M GALLERIES AND OTHER NON–PARTICIPANTS FOR USE IN ACTIONS PENDING IN THE NORWAY, in the Oslo Byfogdembete Court, Case No. 07–129813 TVA–OBYF and in France in the Court of Paris Case No. 07/3133.

In re Application Pursuant to 28 U.S.C. § 1782 for an Order Permitting Christen Sveaas to Take Discovery From David Martinez for Use in Actions Pending in the Oslo Tingrett Court, Case No. 1759459/1 and in France in the Court of Paris Cases No. 07/3133, No. 07/3369 and 07/12847.

No. M19–70.

United States District Court, S.D. New York.

April 1, 2008.

98

Carter, Ledyard & Milburn, LLP (Donald J. Kennedy, Esq., Mark Zancolli, Esq., of counsel), New York, NY, for Petitioner.

Cleary, Gottlieb, Stein & Hamilton, LLP (Jonathan I. Blackman, Esq., Avi E. Luft, Esq., of counsel), New York, NY, for Respondents.

## OPINION & ORDER

JOHN F. KEENAN, District Judge.

### BACKGROUND

Petitioner Christen Sveaas seeks an order (i) pursuant to Federal Rule of Civil Procedure 37(a), compelling Respondents Dominique Levy ("Levy") and L & M Galleries to provide discovery in conformance with an October 1, 2007 stipulation (the "Levy Application"); and (ii) pursuant to 28 U.S.C. § 1728, compelling Respondent David Martinez ("Martinez") to produce documents and appear at a deposition in aid of discovery for three actions that are pending in Norway and France (the "Martinez Application"). The present applications are before me as

the Part One judge.[1] For the following reasons, the applications are in part granted and in part denied.

Christen Sveaas ("Sveaas"), a Norwegian art collector, entered into contracts on July 16, 2007 with Alexandru Botez and Cecilia Botez to purchase "Miss Pogany," a sculpture by the renowned Romanian artist Constantin Brancusi (the "July 16 Agreements"). On August 24, 2007, Alexendru Botez, Alvaro Botez, and Rodica Botez entered into an agreement whereby the Botezes sold "Miss Pogany" to Studio Capital, a Belize company, for 10 million euros (the "Studio Capital Agreement"). The Studio Capital Agreement references the July 16 Agreements and states that those agreements are invalid. The Studio Capital Agreement and a related "Side Agreement" also acknowledge the existence of pending litigation initiated by the Romanian government for repatriation of "Miss Pogany" (the "Romanian proceedings") and contain several different payment options that are exercisable depending on the outcome of the Romanian proceedings.

As a result of being unable to purchase "Miss Pogany" pursuant to the July 16, 2007 Agreements, Sveaas commenced two actions in Norwegian courts and one action in a Parisian court.

First, on August 31, 2007, Sveaas obtained an *ex parte* order from an Oslo "execution and enforcement" court, enjoining Alexandru and Cecilia Botez from selling "Miss Pogany." At the time the injunction was issued, however, the Botezes had already sold "Miss Pogany" to Studio Capital.

Second, also on August 31, 2007, Sveaas obtained from a court in Paris an *ex parte* order directing Alvaro Botez (the only member of the Botez family over whom the French court exercised jurisdiction) to deposit "Miss Pogany" in escrow with a Parisian bank. Alvaro Botez did not comply with this order because, he claimed, the sculpture had already been sold to Studio Capital and thus was no longer in his possession or control. On September 18, 2007, Sveaas obtained an

---

1. The Martinez Application was originally scheduled as a Part One matter to be heard before Judge Cote on December 11, 2007. On December 4, 2007, after hearing oral argument on the

Levy Application, I directed that the Martinez Application be consolidated with the Levy Application.

additional order from the Parisian court, pursuant to which Alvaro Botez was fined 5000 euros a day until he complied with the order of August 31, 2007. In November 2007, the Parisian court denied Alvaro Botez's motion to have the August and September orders retracted. Alvaro Botez appealed the denial of his motion for retraction. On February 15, 2008, while the present applications were pending, the County Court of Paris denied Alvaro Botez's appeal, ordered Botez to pay Sveaas 560,000 euros plus court costs, and imposed a fine of 8000 euros per day on Botez for three months.

Third, on October 12, 2007, Sveaas commenced a breach-of-contract action against the Botezes in Oslo city court. In that lawsuit, Sveaas sought a declaratory judgment that the July 16 Agreements were valid and binding and sought damages for the Botezes' breach of those agreements. That case remains pending.

On September 24, 2007, Sveaas filed an application in the Southern District of New York, pursuant to 28 U.S.C. § 1728, through which he sought discovery from Levy and L & M Galleries, in aid of the pending actions in Norway and France. Levy is an art broker and principal of L & M Galleries who was involved in the Botezes' sale of "Miss Pogany" to Studio Capital. Levy was originally retained by the Botezes to find a buyer for "Miss Pogany". Although the parties argue, as discussed below, whether Levy is more aptly characterized as an "agent" or a "broker," it is clear that her role in the transaction was that of an intermediary who facilitated the transaction between the Botezes and Studio Capital.[2]

Originally, Sveaas sought broad categories of discovery from Levy. For the sake of efficiency, however, Sveaas and Levy agreed to enter into a stipulation that limited the scope of discovery. On October 1, 2007, Judge Duffy so-ordered the parties' proposed discovery stipulation (the "Agreed Order"), which provided for Levy to produce "i) the contract of sale, bill of sale of 'Miss Pogany,' and any contract documents related thereto,

and, ii) all non-privileged documents relating to any negotiations on or after July 1, 2007 between any members of the Botez family and the purchaser of 'Miss Pogany' under the contract and bill of sale referenced in the preceding subparagraph. For all documents claimed as privileged, a privilege log shall be provided." (Aff. Of Donald Kennedy, Ex. 2 ¶ 1.) The Agreed Order also provided for Levy to be deposed regarding the "topics set forth" above and the location of "Miss Pogany," which remains unknown to Sveaas. (Id. ¶ 2.)

On October 25, 2007, pursuant to the Agreed Order, Levy produced documents and attended a deposition. However, Levy refused to disclose and submitted a privilege log that listed certain emails and documents attached thereto which she claimed were protected by attorney client-privilege and the work product doctrine; refused to disclose the invoice of the commission she received from the Botez–Studio Capital transaction, claiming that it was beyond the scope of the Agreed Order; and refused to answer certain questions posed during her deposition as instructed by her counsel. Sveaas claims that Levy's failure to make full disclosure violates the Agreed Order because (1) neither the attorney-client privilege nor the work product rule applies to the withheld documents; (2) the invoice is within the scope of the Agreed Order; and (3) her attorneys should not have interfered with the deposition. Sveaas seeks an order pursuant to Rule 37(a) to compel Levy to comply fully with the Agreed Order.

On November 20, 2007, Sveaas filed a section 1782 application in the Southern District of New York, seeking discovery from Martinez in aid of the pending lawsuits in Oslo and Paris. On the basis of Levy's deposition testimony and documents produced by her, Sveaas believes that Martinez acted as an advisor to Studio Capital in connection with its purchase of "Miss Pogany" and worked with Levy to facilitate the transaction. Given Martinez's likely role in the sale of "Miss Pogany," Sveaas claims that Martinez may

---

2. Levy is represented in this matter by Cleary, Gottlieb, Steen & Hamilton ("Cleary"), the law firm that also represented Studio Capital in con-

nection with the negotiation and execution of the Studio Capital Agreement.

have information, regarding the sculpture's whereabouts and details of the Botez–Studio Capital transaction, that could prove useful to Sveaas' prosecution of the actions in France and Norway. Accordingly, Sveaas seeks an order requiring Martinez: (1) "to produce all documents relating to any negotiations or communications between (a) Levy or any employee of L & M Galleries, (b) any employee advisor, agent, or representative of Studio Capital, Inc., or (c) any member(s) of the Botez family and any third party relating to the sale of 'Miss Pogany' ...."; and (2) "Requiring David Martinez to appear for a deposition." (Appl. of Christen Sveaas for Discovery [from Martinez] at 8.)

On December 4, 2007, after hearing oral argument on the Levy Application, I(i) directed Cleary to submit for *in camera* review the emails and attachments to those emails (comprising twelve documents) that are listed in Levy's privilege log, and (ii) directed the parties to brief the issue of Sveaas' application for discovery from Martinez. On December 18, 2007, I heard oral argument on the Martinez Application.

## DISCUSSION

### (I) The Levy Application

Sveaas seeks an order, pursuant to Federal Rule 37(a)[3], compelling Levy to (a) produce certain documents that Levy claims to be protected by attorney-client privilege or under the work product doctrine; (b) produce an invoice that Levy claims is not within the scope of the Agreed Order;, and (c) respond to certain questions posed at Levy's deposition, which she refused to answer on various grounds.

### (A) Documents in the Privilege Log

Levy claims that the documents listed in her privilege log are (i) protected by the attorney-client privilege, and/or (ii) protected by the work product doctrine.

3. Rule 37(a)(1) provides: "On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification

### (i) Attorney–Client Privilege

The attorney-client privilege provides that "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." *United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997). For a document to be protected by the privilege, it "must contain confidential communication relating to legal advice." *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.),* 139 F.R.D. 295, 300 (S.D.N.Y.1991). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *Teamsters,* 119 F.3d at 214.

The emails that Levy has listed in her privilege log fall into three categories: (1) email chains from David Martinez to Levy reflecting legal advice from Cleary; (2) emails from a Cleary attorney that provided legal advice and on which Levy was copied; and (3) emails from Levy or her assistant (Francois Renet) providing information to a Cleary attorney for the purpose of obtaining legal advice. Attachments to the emails consist of drafts of the Studio Capital Agreement and a memorandum prepared by Cleary's Romanian counsel (the "Romanian Memo") that discusses the history of ownership of "Miss Pogany," the litigation commenced by the Romanian government for repatriation of the sculpture, and the possible outcomes of the litigation.

The basis of Levy's claim of attorney-client privilege is that, while acting as Studio Capital's agent in connection with the Botez–Studio Capital transaction, she provided information to Cleary on Studio Capital's behalf for the purpose of obtaining legal advice. Levy claims that her consultation was essential for Cleary to communicate effectively with its client, Studio Capital.

that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."

Sveaas claims that Levy was not Studio Capital's exclusive agent but rather was contacted by the sellers of "Miss Pogany," the Botez brothers, to assist them in finding a buyer for the sculpture. Thus, Sveaas argues, Levy served merely as a broker to the deal. Further, Sveaas contends that Levy's consultation was not necessary to facilitate attorney-client communications between Studio Capital and Cleary. Thus, Sveaas maintains that Levy was simply a non-necessary third party and that any claim of privilege was lost when the documents at issue were disclosed to her or to those working for her.

▮ The attorney-client privilege is waived by the voluntary disclosure of otherwise privileged material to a third party. *National Educ. Training Group, Inc. v. SkillSoft Corp.*, No. M8–85 (WHP), 1999 U.S. Dist. LEXIS 8680, at *10, 1999 WL 378337, at *3 (S.D.N.Y. June 10, 1999). An exception to this rule applies, however, when the third party is an agent of the client. *Id.* To avoid waiver, the proponent of the privilege must show, first, that the client had a reasonable expectation of confidentiality in the disclosure of the material to the third party, and second, that "disclosure to the third party was necessary for the client to obtain informed legal advice." *Id.* at *12, 1999 WL 378337, at *4.

▮ Two questions arise: first, whether Levy, as a third party, was actually an agent of Studio Capital; and second, assuming that Levy did in fact act as Studio Capital's agent, whether Levy's receipt of those documents was necessary for Studio Capital to obtain informed advice from Cleary.[4]

The record suggests that Levy did not function as Studio Capital's exclusive agent. Although Levy testified expressly that she was Studio Capital's agent, rather than a broker, Levy's deposition testimony suggests that she was acting equally on the Botezes' behalf. Levy testified that she was approached by the Botezes eight years ago regarding the sale of "Miss Pogany". She

was approached again by two members of the Botez family in 2007 in connection with the sale of the sculpture and communicated regularly with the Botezes in August 2007 regarding the sale. By contrast, as Sveaas points out, Levy testified that she had only "one or two conversations with Studio Capital ... between July 1, 2007 and the August 24, 2007 date of the [Studio Capital] Agreement." (Sveaas Rep. Mem. at 2.) Levy further testified that "she had no meetings with Studio Capital, did not send any draft agreements for the sale of Miss Pogany to Studio Capital, did not recall sending any documents to Studio Capital, did not communicate with anyone at Studio Capital regarding the [Studio Capital] Agreement, did not know who signed the [Studio Capital] Agreement on behalf of Studio Capital, and did not know who owns Studio Capital." (*Id.* at 2–3.) These facts undercut Levy's assertion that she functioned as Studio Capital's exclusive agent rather than as a broker who worked for both parties to facilitate the sale. The most accurate description of Levy's role is that of intermediary. She was initially engaged by the sellers, worked to ensure that the deal closed, and was paid a commission by the buyer. Levy was not retained by Cleary or by Studio Capital. Thus, for purposes of determining whether the attorney-client privilege applies, Levy cannot be considered to be an agent of Studio Capital.

In any event, regardless of how Levy's position is defined, she did not play an indispensable role in facilitating attorney-client communications between Studio Capital and Cleary. *See Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 103–04 (S.D.N.Y.2007) ("[T]he involvement of the third party [must] be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications.") At best, Levy may have provided some help to Cleary in clarifying certain factual issues surrounding the sale of "Miss Pogany" that had legal implications. However, "where the third party's presence is merely 'useful' but not 'necessary,' the privilege is lost." *Id.* at 104. Levy's participation in communications

---

4. The parties do not dispute that Studio Capital had a reasonable expectation of confidentiality in

the disclosure to Levy of the documents at issue.

between Cleary and Studio Capital is distinguishable from situations where, for example, an accountant participates in attorney-client communications and "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir.1961) (Friendly, C.J.). As Sveaas correctly notes, Cleary did not require Levy to explain or clarify contract negotiations between the Botezes and Studio Capital, especially where Levy herself was a signatory to the Bill of Sale, a prospective recipient of a commission, and thus an interested party to the transaction. Further, it is highly doubtful that Cleary needed Levy's services to help explain to Studio Capital the legal ramifications of the Romanian proceedings, especially where Cleary had engaged its own Romanian counsel to address precisely that issue.

In sum, Levy did not function as Studio Capital's exclusive agent, and her participation in the transaction of "Miss Pogany" was not necessary to Cleary's furnishing of legal advice to Studio Capital. Accordingly, the emails and attachments listed on the privilege log, all of which were sent to Levy and/or her assistant, are not protected by the attorney-client privilege.

*(ii) Work Product Doctrine*

■ "The work-product doctrine, codified for the federal courts in Rule 26(b)(3) of the Federal Rules of Civil Procedure, is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). "Analysis of one's case in anticipation of litigation is a classic example of work product and receives heightened protection under Fed.R.Civ.P. 26(b)(3)." *Id.* at 1197 (internal quotation marks and citation omitted). The Second Circuit has held that "documents should be deemed prepared in anticipation of litigation, and thus within the scope of [ ] Rule [26], if 'in light of

the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Id.* at 1202 (quoting Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)). Work product protection is withheld from documents that "are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation .... [E]ven if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation." *Id.*

■ Attached to several of the emails listed in the privilege log are drafts of the Botez–Studio Capital sale agreement. Levy claims that these drafts are covered by the work product rule because they contain conditional provisions that account for various different outcomes in the pending Romanian proceedings; therefore, the argument goes, the drafts were prepared with an eye toward the litigation in Romania and should be deemed work product.

Sveaas asserts that the drafts of the sale agreements were prepared in the ordinary course of business and would have been drafted in substantially similar form even if there was no litigation in Romania. Therefore, he claims, the documents were not prepared in anticipation of litigation and the work product rule is inapplicable.

The drafts of the Studio Capital Agreements and the related emails were not prepared "because of" litigation within the meaning of Rule 26(b)(3). Although the contract drafts contained "call options" that reflected the possible outcomes of the Romanian proceedings and the effect each outcome would have on "Miss Pogany"'s ultimate purchase price, the drafts were composed in order to move toward the final execution of the sale of "Miss Pogany" to Studio Capital. There is no indication that the Romanian proceedings themselves were the motivating force behind the preparation of the contract drafts. Rather, the litigation in Romania merely led the parties to include various

options in the contract in order to allocate risk properly in light of the pending litigation's possible outcomes. Thus, regardless of the Romanian proceedings, the contract drafts would have been prepared in substantially similar form. Accordingly, those drafts and the related emails, do not fall within the protective ambit of the work product doctrine.

However, the Romanian Memo, which was prepared by Cleary's Romanian counsel and is attached to emails in both Documents # 1 and # 2 in the privilege log, was drafted for the sole purpose of addressing the Romanian proceedings and analyzing the ramifications of the litigation for the owner of "Miss Pogany." Thus, the Romanian Memo, as well as the cover email on page two of Document # 1 and the very brief cover emails in Document # 2, fall within the scope of the work product doctrine.

*(B) Levy's Commission Invoice*

■ The dispute over disclosure of Levy's invoice for her commission on the sale of "Miss Pogany" turns on how broadly the Agreed Order should be read. The Agreed Order requires Levy to produce "the contract of sale, bill of sale of 'Miss Pogany,' and any contract documents related thereto." Levy claims that the invoice is irrelevant to the foreign proceedings, because it bears no relation to the central material issue of the foreign proceedings, namely whether the July 16 Agreements were binding on the Botezes. Levy also argues that her commission invoice is not related to the contract of sale or bill of sale of the sculpture, and therefore is beyond the scope of the Agreed Order.

Levy's argument that the invoice is irrelevant to the foreign proceedings is unavailing. As discussed at greater length below, relevance is defined extremely broadly for the purpose of determining whether to grant a request for discovery in aid of a foreign proceeding, and a district court should treat

requests for discovery in aid of foreign proceedings, under section 1782, permissively, especially where, as here, the discovery is sought from a non-party to the foreign actions.

In any event, even assuming that the invoice is not relevant to the foreign actions, Levy's execution of the Agreed Order required her to disclose any non-privileged "contract document" that relates to the Studio Capital Agreement and/or Bill of Sale, regardless of any claim that such documents lack relevance. Levy's commission invoice is a "contract document" that "relates" to the Bill of Sale, because it states the commission that Levy received for acting as a broker of the sale. Thus, because the invoice is properly deemed a "contract document" within the meaning of the Agreed Order, Levy must disclose the invoice.

*(C) Levy's Refusal to Answer Deposition Questions*

Sveaas claims that Cleary's instruction to Levy at her deposition not to answer certain questions was improper under Federal Rule 30(c)(2) because Cleary first should have sought clarification from the Court about whether the questions fell within the scope of the Agreed Order.[5] Sveaas argues that the questions at issue sought to clarify Levy's role in brokering the Botez–Studio Capital transaction and thus fell within the scope of the Agreed Order. Therefore, Sveaas argues, the Court should compel Levy to answer the questions. Sveaas also seeks sanctions under Rule 30(d)(3) against Cleary for impeding the deposition.

There were three instances when Levy's counsel instructed her not to answer questions. First, Levy was instructed not to answer when she was asked about her communications with the Botez family about the sculpture *prior* to July 1, 2007, whereas the Agreed Order expressly limits discovery to "any negotiations on or after July 1, 2007." Second, Levy was instructed not to respond

---

**5.** Federal Rule 30(c)(2) provides that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." The parties cite this provision as Federal Rule 30(d)(1), but amendments to the rule that went into effect on December 1, 2007 changed the numbering of the sub-section.

when she was questioned about the specifics of the commission that she received on the sale of Miss Pogany. Third, she was instructed not to answer when asked about the details of the bank account into which she deposited the commission.

Levy cannot be compelled to answer the question regarding her communications with the Botezes prior to July 1, 2007. As Levy correctly points out, the Agreed Order limits the request for documents to those relating to negotiations on or after July 1, 2007, and paragraph two of the Agreed Order states that the deposition is limited to topics "set forth in paragraph one and the location of the 'Miss Pogany' sculpture." The issue of Levy's pre-July 1 communications with the Botezes simply does not relate to post-July 1 communications or the question of the sculpture's whereabouts.

Levy also cannot be compelled to answer the question regarding details of her bank account. This is personal financial information that is not within the permissible scope of the deposition as set forth in the Agreed Order.

Levy is required, however, to answer the question regarding her commission. As noted, the commission relates to the sale of the sculpture. In the event that disclosure of the invoice itself does not fully satisfy Sveaas' inquiry, Sveaas may depose Levy on the issue of her commission through written questions. *See* Fed.R.Civ.P. 30(c)(3).

### (II) The Martinez Application

Sveaas seeks an order, pursuant to 28 U.S.C. § 1782[6], directing Martinez to produce all documents within his possession or control "relating to any negotiations or communications between (a) Levy or any employee of L & M Galleries, (b) any employee advisor, agent, or representative of Studio Capital, Inc., or (c) any member(s) of the Botez family and any third party relating to the sale of 'Miss Pogany' . . . ." and directing Martinez to appear at a deposition. (Appl. Of Christen Sveaas for Discovery [from Mar-

tinez] at 8.) Sveaas claims that Martinez is an advisor of Studio Capital who has knowledge of the negotiations that transpired between the Botezes and Studio Capital and may have knowledge of the whereabouts of "Miss Pogany". Sveaas asserts that any such information in Martinez's possession is relevant to the pending proceedings in Oslo and Paris and thus discoverable under section 1782. Although Martinez has submitted a declaration in which he denies having any knowledge of "Miss Pogany"'s location, denies having met or corresponded with the Botezes in connection with the sale of "Miss Pogany", and denies having any knowledge of the July 16 Agreements, Sveaas cites to deposition testimony by Levy that indicates that Martinez was in fact extensively involved in the negotiations with the Botezes and that purportedly contradicts Martinez's declaration that he never corresponded with the Botezes or their attorney. Sveaas also has submitted a declaration by Andre Sporri, an officer of a Belize company that serves as a director of Studio Capital. Sporri states in his declaration that "Miss Pogany" is in a safe and secure place. Sveaas contends that Sporri's knowledge of the sculpture's location can be imputed to Martinez, because Sporri apparently works for Martinez and submitted his declaration at Martinez's behest.

Sveaas asserts that the "document request is reasonable in scope and intended only to discover information relating to the sale of 'Miss Pogany' by members of the Botez family for use in (1) the Oslo litigation to discover the current location of the sculpture in order to achieve the relief sought in the Oslo Litigation or (2) the Paris Proceeding to satisfy the outstanding (and ignored) court order mandating Alvaro Botez deposit 'Miss Pogany' in a safe deposit box in France." (Sveaas Rep. Br. at 7.) Sveaas has provided declarations from his attorney in the Oslo litigation and his attorney in the Paris proceeding. According to Sveaas' Oslo attorney, Sveaas seeks via the Oslo litigation not merely damages for breach of contract, but a declaration

---

**6.** 28 U.S.C. § 1782 provides in relevant part: "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a docu- ment or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation."

that the July 16 Agreements are binding and, by extension, "to be declared the rightful owner of the sculpture and to have the sculpture handed over to him." (Evertsen Decl. ¶ 12.) Thus, the argument goes, any light Martinez could shed on the sculpture's location could be relevant to Sveaas' enforcement of his rights under the July 16 Agreements should he prevail in the Oslo litigation. According to Sveaas' Parisian attorney, Martinez's knowledge of the sculpture's location and/or knowledge of the negotiations between the Botezes and Studio Capital could help to establish whether Alvaro Botez currently "has custody and control of the sculpture" and whether he "did not have it on August 31, 2007," and thus be useful in helping to resolve disputed issues in the French action. (Xavier–Bender Decl. ¶ 16, 17.)

Sveaas also maintains that an order compelling the discovery sought is warranted because it would satisfy the dual policy aims of section 1782, first by providing efficient assistance in the Oslo and Paris litigations and, second, by encouraging Norway and France to provide similar assistance to American courts in the future.

Martinez opposes the application on the ground that the requested discovery is irrelevant to the pending actions in Oslo and Paris and thus is not "for use" in a foreign proceeding, within the meaning of section 1782. Martinez has submitted the declarations of a Norwegian lawyer and a French lawyer who represent the Botezes in the foreign actions. Citing to the declaration of the Norwegian attorney, Martinez states that the sole contested issue in the breach-of-contract proceeding pending in Oslo city court is whether the July 16 Agreements were binding, specifically whether Cecilia Botez had a valid power of attorney to enter into the July 16 Agreements on behalf of her uncle, Alvaro Botez. Martinez maintains that the only relief sought in the action is for damages for breach of contract and that there is no claim for specific performance. Martinez argues that, to the extent that Sveaas seeks "information regarding communications between

Studio Capital, its two representatives, Mr. Martinez and Ms. Levy and any third party and/or the Botez family relating to the sale of 'Miss Pogany,'" such information has no bearing on the July 16 Agreements. (Martinez Mem. at 13.) To the extent that Sveaas seeks discovery relating to any agreements between (a) Levy, agents or advisors of Levy, or the Botez family and (b) any third party, Martinez argues that the request is both overbroad, because it seeks information that is not limited to the sale of "Miss Pogany" and irrelevant, because it has no bearing on the foreign actions. To the extent that Sveaas seeks information from Martinez regarding the whereabouts of the sculpture, and information designed to uncover the "real" buyer(s) of the sculpture, Martinez contends again that "there is no conceivable explanation for how any of these items is in any way relevant to whether the July 16 Agreements are binding, nor is any offered." (*Id.* at 15.)

In support of his opposition to the requested discovery, Martinez has submitted a declaration in which he states that he has no knowledge of the July 16 Agreements; has never met with or spoken with Sveaas, the Botezes, or their attorney[7]; and possesses no documents that relate to the July 16 Agreements, apart from the Studio Capital Agreement itself (which notes the existence of the July 16 Agreements and contends that they are not valid). Further, Martinez declares that he has no knowledge of the whereabouts of Miss Pogany.

In addition, Martinez argues that Sveaas' section 1782 application should be dismissed because Martinez was improperly served.

A court may grant discovery under section 1782 where the court first finds that (1) the party from whom discovery is sought can be found in the district where the application is made; (2) the discovery will be used in a foreign proceeding; and (3) the party applying for discovery is an interested person in the foreign proceeding. *See In re Ishihara Chemical Co., Ltd.,* 251 F.3d 120, 124 (2d Cir.2001). Once a court has found

---

7. Martinez concedes that he met with one of the Botez brothers, Timon Botez, in April and August of 2007, but on those occasions was told nothing about agreements or negotiations involving Sveaas.

that these statutory factors exist, the court is granted "wide discretion to determine whether to grant discovery and equally wide discretion to tailor such discovery to avoid attendant problems." *Esses v. Hanania (In re Esses),* 101 F.3d 873, 876 (2d Cir.1996). A court acts within its discretion "so long as the district court fashions its order in accordance with the 'twin aims' of § 1782, [1] 'providing efficient means of assistance to participants in international litigation in our federal' courts and [2] encouraging foreign countries by example to provide similar means of assistance to our courts.'" *Id.* (quoting *In re Application of Malev Hungarian Airlines,* 964 F.2d 97, 100 (2d Cir.1992)). A court presented with a section 1782(a) request "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance" in determining whether a discovery order should be granted in a particular case and "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264–65, 124 S.Ct. 2466, 159 L.Ed.2d 355 (U.S.2004). In addition, "when the person from whom discovery is sought is a participant in the foreign proceeding ..., the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.* at 264, 124 S.Ct. 2466.

If a district court is concerned that granting discovery may prove problematic, the court is "well-equipped to determine the scope and duration of that discovery." *Id.* "[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order than by simply denying relief outright." *In re Application of Euromepa, S.A.,* 51 F.3d 1095, 1101 (2d Cir.1995). "Of course, if the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably

seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation." *Id.; see also Metallgesellschaft v. Hodapp (In re an Order Permitting Metallgesellschaft AG to Take Discovery),* 121 F.3d 77, 79 (2d Cir. 1997) (noting that if a court " 'suspects that the [§ 1782 discovery] request is a "fishing expedition" or a vehicle for harassment, the district court should deny the request' ") (quoting *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago,* 848 F.2d 1151, 1156 (11th Cir.1988)).

Here, it is undisputed that Martinez can be found in the Southern District of New York and that Sveaas is an interested person within the meaning of section 1782—in other words, that the first and third of the three statutory elements are satisfied. Martinez claims that the discovery sought is not relevant to Sveaas' claims in the foreign actions, is unduly burdensome, and therefore is not "of use" in the foreign proceedings. Thus, Sveaas' application turns on whether the materials sought are relevant.

The proper scope of the discovery sought under section 1782, like all federal discovery, is governed by Federal Rule 26(b). *See, e.g., In re Application of Malev Hungarian Airlines,* 964 F.2d at 102 (noting that "the district court retains broad authority under Fed.R.Civ.P. 26(b)(1)" to fashion discovery orders issued pursuant to section 1782). *See also In re Bayer AG,* 146 F.3d 188 (3d Cir. 1998) (reference in 28 U.S.C. § 1782 to Federal Rules of Civil Procedure suggests that, under ordinary circumstances, standards for discovery under those Rules should also apply when discovery is sought under section 1782).

Rule 26 provides, in relevant part, that "[p]arties may obtain discovery regarding any nonprivileged matter that is *relevant* to any party's claim or defense." Fed.R.Civ.P. 26(b)(1) (emphasis added). For purposes of discovery, relevance as it relates to the subject matter of an action is broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may

be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). The term "reasonably calculated" in Rule 26(b)(1) means "any possibility" that the information sought may be relevant. *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 122 F.R.D. 447, 449 (S.D.N.Y.1988) (quoting Fed.R.Civ.P. 26(b)(1)). Where relevance is in doubt, the district court should be permissive. *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 301 (S.D.N.Y.2003). Relevance under Federal Rule 26 is far broader than the standard under Federal Rule of Evidence 401, which governs the standard at trials. *See Arch Assocs. v. HuAmerica Int'l.*, No. 93 Civ. 2168, 1994 U.S. Dist. LEXIS 746, at *3, 1994 WL 30487, at *1 (S.D.N.Y. Jan. 28, 1994).

The parties disagree about whether the information that Martinez may be able to provide could be relevant to the pending proceedings in Norway and France. The Court has received conflicting statements, in the form of the declarations of opposing counsel in the French and Norwegian actions, about what the contested issues are in the foreign litigations. Similarly, the questions of whether Martinez knows the location of "Miss Pogany" or has information regarding the Botez–Studio Capital negotiations are the subject of factual dispute. Given the broadly permissive standard by which a court evaluates the relevance of discoverable material, and the parties' presentation of a factual dispute regarding the relevance of the discovery sought, it is inappropriate to deny Sveaas' discovery requests on the ground that the requested discovery is irrelevant to Sveaas' foreign claims. Further, because the Court is called upon only to resolve a discovery issue that arises from underlying litigation in foreign jurisdictions, the court should be particularly wary of denying discovery on relevance grounds. *See In re Honeywell Int'l*, 230 F.R.D. at 301 (stating that a court " 'whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant

to pass judgment on what constitutes relevant evidence thereunder' ") (quoting *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d 1207, 1211–12 (Fed.Cir.1987)).[8] Finally, there is no indication that Sveaas' request for discovery from Martinez is motivated by bad faith, is intended to harass Martinez, or seeks cumulative material.

Further, as Sveaas points out, a grant of discovery would not thwart the dual policy aims of section 1782. Assuming that the material sought is relevant to the pending claims, a grant of discovery would, first, provide Sveaas with an "efficient means of assistance ... in our federal courts" and, second, conceivably encourage Norway and France "by example to provide similar means of assistance to our courts." *In re Application of Malev Hungarian Airlines*, 964 F.2d at 100. Although no foreign government or court has affirmatively requested the assistance of this Court in obtaining discovery, this is not a case where the foreign forums have been expressly unreceptive to an American court's intercession. *Compare Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir.2004) (upholding denial of section 1782 discovery application where district court "was faced with specific requests from the German Ministry of Justice and the Bonn Prosecutor to deny petitioners the discovery they sought" and "carefully considered various appropriate factors including 'the receptivity of the foreign government ... to federal-court judicial assistance' in deciding how to exercise its considerable discretion under 28 U.S.C. § 1782") (quoting *Intel*, 542 U.S. at 264, 124 S.Ct. 2466).

Finally, Martinez's status as a non-party in the foreign actions weighs in favor of granting Sveaas' application. Because Martinez would not be subject to the jurisdiction of either the French or Norwegian court, the need for an order of discovery from this Court is more apparent. *See Intel*, 542 U.S. at 264, 124 S.Ct. 2466.

Martinez cites a recently issued opinion from this District, *In re Biovail Corp. Sec.*

---

**8.** Although the court in *Honeywell* was called on to decide a motion to quash a subpoena rather than an application under section 1782, the principles are the same: a court that is called upon

only to adjudicate a discovery matter and that has limited familiarity with the facts of the underlying action should treat discovery requests permissively.

*Litig.*, 247 F.R.D. 72 (S.D.N.Y.2007), in which Judge Owen denied the movant's request for a subpoena to be issued on third parties, for the proposition that the Court should deny the requested discovery in this matter. Although Martinez contends that *Biovail* is "strikingly similar" to the instant application, that case, a securities fraud action in which the movant sought to serve subpoenas under Rule 45, is readily distinguishable. First, unlike the present matter, *Biovail* involved a request for discovery that was not merely ancillary to an underlying action in another jurisdiction, but was also for use in the *Biovail* case itself, a case over which Judge Owen had presided for four years and with whose facts he was intimately familiar. Second, Judge Owen found that the discovery sought "could cost millions of dollars" and that the "burden of production far outweighs any probative value." (*Id.* at 74.) Here, there is no suggestion that the cost of producing discovery would be particularly expensive or burdensome. Third, the court evaluated the motion in light of the movant's (Biovail's) previously having violated a stipulated protective order. In this matter, by contrast, there is no history of non-compliance with prior orders on Sveaas' part that would caution against granting the requested discovery. Finally, Judge Owen noted that Biovail could have impleaded the third parties from whom it sought discovery; having chosen instead to proceed by separate litigation against those third parties in another jurisdiction, Biovail "cannot now have combined discovery." (*Id.* at 75.) Here, as noted, there is no indication that Sveaas could have impleaded Martinez in the actions pending in Norway and France. In sum, *Biovail* is inapposite to the present matter.

Martinez's argument regarding purported improper service of process of the section 1782 application can be quickly dispatched. As Sveaas correctly points out, section 1782 "contains no provision mandating service in accordance with Rule 5" of the Federal Rules of Civil Procedure. (Sveaas Rep. Mem. at 9.) Further, Martinez received timely notice of the petition—and has timely responded to it. His claim that a defect in service warrants dismissal of the application simply has no basis in law or fact.

*The Scope of the Requested Discovery*

Although grant of Sveaas' section 1782 application is warranted, the discovery request as stated is overbroad. Sveaas offers no good reason why the discovery that he seeks from Martinez should be substantially broader than the discovery he agreed to obtain from Levy, as set forth in the Agreed Order. Accordingly, the parties are directed to submit to the Court a stipulation, providing for Martinez to disclose documents and appear for a deposition, that is co-extensive with the parameters of discovery that the parties established in the Agreed Order.

## CONCLUSION

Levy is ordered to disclose all of the documents contained in the privilege log with the exception of the following documents, which are protected under the work product doctrine: the Romanian Memo, which is attached to both Document # 1 and Document # 2 of the privilege log; the cover email on page two of Document # 1; and the cover emails in Document # 2.

Levy is also ordered to disclose the invoice relating to her commission for the sale of "Miss Pogany." Should Sveaas have additional questions, relating to issues within the scope of the Agreed Order, about the specifics of the commission invoice after disclosure of the invoice itself, Sveaas may address questions relating to that issue to Levy via written deposition, in conformance with the procedures set forth in Federal Rule 30(c)(3).

Martinez and Sveaas are directed to submit a stipulation to the Court, within twenty (20) days of the entry of this Order, providing for discovery to be obtained from Martinez that is co-extensive with the discovery agreed upon by the parties in the Agreed Order.

**SO ORDERED.**