**14-1965-cv**
**Schaeffler v. USA**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2014

(Argued:  April 16, 2015            Decided: November 10, 2015)

Docket No. 14-1965-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GEORG F.W. SCHAEFFLER, SCHAEFFLER HOLDING GMBH & CO. KG, INA-
HOLDING SCHAEFFLER GMBH & CO. KG, SCHAEFFLER HOLDING, LP,
     Petitioners-Appellants,

          v.

UNITED STATES OF AMERICA,
     Respondent-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:  WINTER, WALKER, AND DRONEY, Circuit Judges.

     Appeal from a denial of a petition to quash an IRS summons by the United States District Court for the Southern District of New York (Gabriel W. Gorenstein, Magistrate Judge). We hold that the attorney-client privilege was not waived by the sharing of documents with a consortium of banks having a common legal interest with appellants and that the summons sought materials protected by the work-product doctrine. We vacate and remand.

M. TODD WELTY (Mark P. Thomas, Laura L. Gavioli, Richard D. Salgado, on the brief) Dentons US LLP, Dallas, TX, for Petitioners-Appellants.

REBECCA S. TINIO, Assistant United States Attorney (Preet Bharara, United States Attorney for the Southern District of New York, Emily E. Daughtry, Assistant United States Attorney, New York, NY, of counsel), for Respondent-Appellee.

Amar Sarwal, Wendy Ackerman, Association of Corporate Counsel, Washington, DC, for Amicus Curiae Association of Corporate Counsel.

Kate Comerford Todd, Warren Postman, U.S. Chamber Litigation Center, Inc., Washington, DC, Robert A. Long, Reeves C. Westbrook, Marianna Jackson, Jason Yen, Covington & Burling LLP, Washington, DC, for Amicus Curiae Chamber of Commerce of the United States of America.

WINTER, Circuit Judge:

Georg F.W. Schaeffler ("Mr. Schaeffler" or "Schaeffler") and associated entities ("Schaeffler Group") (collectively "appellants") appeal from Magistrate Judge Gorenstein's order denying a petition to quash an IRS summons.[1]  We conclude that: (i) the attorney-client privilege was not waived by appellants' provision of documents to a consortium of banks ("Consortium") sharing a common legal interest in the tax treatment of a refinancing and corporate restructuring resulting from an ill-fated acquisition originally financed by the Consortium; and (ii)

---

[1] This court has jurisdiction under I.R.C. § 7609(h)(1) which allows, inter alia, appellate review of an order denying a petition to quash an IRS summons.

2

the work-product doctrine protects documents analyzing the tax treatment of the refinancing and restructuring prepared in anticipation of litigation with the IRS.  We therefore vacate and remand.

BACKGROUND

The pertinent facts are not in dispute.

a) The Acquisition

The Schaeffler Group is an automotive and industrial parts supplier incorporated in Germany.  Mr. Schaeffler, a resident of Dallas, Texas, is an 80% owner of the ultimate parent of the Schaeffler Group.  This appeal arises from an attempt by the Schaeffler Group to acquire a minority interest in a German company, Continental AG, through a tender offer for its stock. German law prohibits tender offers that seek less than all of a company's shares.  As a result, a partial offer can be accomplished only by setting an offering price estimated to result in the acquisition of the desired number of shares.  This course was followed by the Schaeffler Group with regard to Continental AG.

To finance the offer, the Schaeffler Group executed an eleven-billion Euro loan agreement with a consortium of banks. On July 30, 2008, the offer was made with an acceptance period ending on September 16, 2008.  Because of German law, the timing of the offer was unlucky, to say the least.  On September 14,

3

2008, two days before the end of the acceptance period, Lehman Brothers Holding Inc. announced its bankruptcy, the stock market collapsed, and the economic crisis worsened. The market price of Continental AG shares, already declining, fell accordingly. Because German law prohibited the Schaeffler Group from withdrawing its tender offer, far more shareholders than expected or desired accepted the offer, leaving the Schaeffler Group the owner of nearly 89.9% of outstanding Continental AG shares.

These circumstances combined to threaten the Schaeffler Group's solvency and ability to meet its payment obligations to the Consortium. As a result, appellants and the Consortium perceived an urgent need to refinance the acquisition debt and to restructure the Schaeffler Group. Under United States law, because Mr. Schaeffler is an 80% owner of the ultimate parent of the Schaeffler Group, the tax consequences of his companies' debt refinancing and restructuring substantially affected his personal tax liability to the IRS. Given the complex and novel refinancing and restructuring that ensued, appellants anticipated scrutiny by the IRS. Therefore, they retained Ernst & Young ("EY") and Dentons US LLP ("Dentons") to advise on the federal tax implications of the transactions and possible future litigation with the IRS.

As anticipated, the IRS began an audit of appellants that led to the issuance of the summons at issue in this appeal. The

4

summons sought "all documents created by Ernst & Young, including but not limited to legal opinions, analysis and appraisals, that were provided to parties outside [appellants], that relate to [the restructuring]."  The summons did not request documents prepared by Dentons, appellants' law firm, or those shared only among their counsel and EY.  Appellants produced several thousand documents in response to the information document request from the IRS but sought to quash the demand for legal opinions.  For example, appellants sought to withhold memoranda, such as an EY memorandum ("EY Tax Memo") that identified potential U.S. tax consequences of the refinancing and restructuring, identified and analyzed possible IRS challenges to the Schaeffler Group's tax treatment of the transactions, and discussed in detail the relevant statutory provisions, U.S. Treasury regulations, judicial decisions, and IRS rulings.

b) The District Court's Ruling

In denying the petition to quash, the district court held that appellants had waived their attorney-client privilege by sharing the withheld documents with the Consortium.  The court noted that "[b]y all accounts, the Schaeffler Group, Ernst & Young, and Dentons worked closely with the Bank Consortium not only in effectuating the refinancing and restructuring but also in analyzing the tax consequences of the [Continental AG]

5

acquisition."[2] Sp. App'x at 6. The court held that the "common legal interest" or "joint defense privilege" exception to the waiver by third-party disclosure rule did not apply.[3] In the court's view, the Consortium "lack[ed] . . . any common legal stake in Schaeffler's putative litigation with the IRS," because it would not be named as a co-defendant in the anticipated litigation and "only the Consortium's economic interests," as opposed to its legal interests, "were in jeopardy." Sp. App'x at 20. Therefore, appellants and the Consortium did not have a common legal interest and were not "formulating a common legal strategy." Accordingly, appellants' attorney-client privilege had been waived. Sp. App'x at 15 (internal quotation marks omitted).

The district court also rejected appellants' claim that the documents in question were protected under the work-product doctrine. It first ruled that work-product protection had not been waived by the sharing of information with the Consortium

---

[2] When the Schaeffler Group and the Consortium agreed to share legal analyses, they signed an agreement, styled the "Attorney Client Privilege Agreement." Of course, the title of that agreement was not binding on the district court and is not binding on us. The Agreement is relevant, however, to the issues of whether the Schaeffler Group and the Consortium maintained confidentiality with regard to third parties and were pursuing a common legal interest.

[3] Title 26 U.S.C. § 7525(a)(1) provides that "the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney." This "tax practitioner privilege" is, therefore, essentially coterminous with the attorney-client privilege both in scope and in waiver. See United States v. BDO Seidman, 337 F.3d 802, 810 (7th Cir. 2003).

6

because the disclosure was "in furtherance of Schaeffler and the Bank Consortium's common commercial desire to avoid Schaeffler's default and insolvency." Sp. App'x at 26. It reasoned that the common interests of appellants and the Consortium were sufficiently strong as to not "materially increase[] the likelihood of disclosure [of protected information] to an adversary." Sp. App'x at 27 (internal quotation marks omitted) (alteration in original).

However, the district court held that the EY Tax Memo and, presumably, other similar documents were not entitled to work-product protection. After conducting an in camera review of the EY Tax Memo, the district court described it as containing: (i) "detailed legal analysis of the federal tax issues implicated," (ii) "assert[ions] that there is no law clearly on point," (iii) "language such as 'although not free from doubt,' 'the better view is that,' 'it may be argued,' and 'it is not inconceivable that the IRS could assert'; and (iv) "arguments and counter-arguments that could be made by Schaeffler and the IRS with regard to the appropriate tax treatment of [the refinancing and restructuring]." Sp. App'x at 28.

The district court noted that the EY Tax Memo "does not specifically refer to litigation . . . by discussing what actions peculiar to the litigation process [the parties] might take or what settlement strategies might be considered." Id. The court

7

concluded that appellants would have engaged in the "detailed and complex process of resolving" the unusual tax issues even if they did not anticipate any litigation. Sp. App'x at 29. It reasoned that "Schaeffler is a rational businessperson" who "would have sought out the type of tax advice provided by Ernst & Young about the transaction had he not been concerned about an audit or litigation with the IRS." Sp. App'x at 30-31. Because "any sophisticated businessperson engaging in a complex financial transaction will naturally wish to obtain advice on the relevant tax laws so that the transaction can be structured in such a way as to receive the most favorable tax treatment possible," the court ruled that, "given our assumption that Schaeffler is a rational businessperson who routinely makes efforts to comply with the law, we find that, even had he not anticipated an audit or litigation with the IRS, he still would have had to obtain the type of legal assistance provided by Ernst & Young to carry out the refinancing and restructuring transactions in an appropriate manner." Sp. App'x at 30-31.

The court further stated that "petitioners have presented no facts suggesting that Ernst & Young would have acted any differently" or given advice "different in content or form had it known that no audit or litigation would ensue." Sp. App'x at 31. In support, the district court relied upon a Treasury Department Circular and a Treasury regulation regarding tax shelters that

8

forbid tax practitioners from taking into account "the possibility that a tax return will remain unaudited" in providing tax advice to clients. Sp. App'x at 31. The court read this regulation to require EY to provide Schaeffler with exactly the information contained in the EY Tax Memo, in exactly the same form, regardless of the likelihood of an IRS audit. The court also relied on its view that the language of the EY Tax Memo did not "indicate that the authors are describing any particular anticipated litigation," notwithstanding the document's detailed discussion of legal strategies. Sp. App'x at 33. Accordingly, the court ruled that the EY Tax Memo and related documents were not protected from disclosure under the work-product doctrine.

DISCUSSION

a) Waiver of the Attorney-Client Privilege

We review the district court's finding of waiver of the attorney-client privilege for abuse of discretion. In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000). An abuse of discretion occurs when a district court: (i) bases a decision on an error of law or (ii) makes a factual finding that is clearly erroneous or outside the range of permissible decisions. Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001).

The IRS summons seeks only those documents prepared by EY "that were provided to parties outside the Schaeffler Group." J. App'x at 46. There being no evidence indicating disclosure of

9

some or all of the documents beyond the Consortium, we need determine the effect of disclosure to the Consortium. As noted, the district court held that appellants waived that privilege by sharing the contested documents with the Consortium because the Consortium's interest was commercial rather than legal.

The purpose of the attorney-client privilege is to enable attorneys to give informed legal advice to clients, which would be undermined if an attorney had to caution a client about revealing relevant circumstances lest the attorney later be compelled to disclose those circumstances. The privilege, and by extension the tax practitioner privilege, see Note 3, supra, protects communications between a client and its attorney that are intended to be, and in fact were, kept confidential. A party that shares otherwise privileged communications with an outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential. Moreover, the purpose of the communications must be solely for the obtaining or providing of legal advice. United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011). See In re John Doe Corp., 675 F.2d 482, 488 (2d Cir. 1982). Communications that are made for purposes of evaluating the commercial wisdom of various options as well as in getting or giving legal advice are not protected. See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984).

10

While the privilege is generally waived by voluntary disclosure of the communication to another party, the privilege is not waived by disclosure of communications to a party that is engaged in a "common legal enterprise" with the holder of the privilege. Under United States v. Schwimmer, 892 F.2d 237 (2d Cir. 1989), such disclosures remain privileged "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel . . . in the course of an ongoing common enterprise . . . [and] multiple clients share a common interest about a legal matter." Id. at 243 (internal citations and quotation marks omitted). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." Id. at 243 (citing Daniel J. Capra, The Attorney-Client Privilege In Common Representations, 20 Trial Law. Q., Summer 1989, at 21).

Parties may share a "common legal interest" even if they are not parties in ongoing litigation. Id. The common-interest-rule serves to "protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." Id. at 243. "[I]t is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client

11

privilege to apply[.]" Id. at 244 (citations omitted). However, "[o]nly those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected." Id. at 243. The dispositive issue is, therefore, whether the Consortium's common interest with appellants was of a sufficient legal character to prevent a waiver by the sharing of those communications. We hold that it was.

The original relationship between the Schaeffler Group and the Consortium arose before the economic crisis and the resultant oversubscription to the Schaeffler Group's tender offer that necessitated the refinancing and restructuring. However, once the tender offer was made, the relationship was altered. Because the tender offer could not be withdrawn under German law, the Consortium and the Schaeffler Group were, respectively, locked into the loan and to the offering price. As a result of the oversubscription, the Schaeffler Group faced a threat of insolvency that would in turn cause a default on the Consortium's eleven-billion Euros loan. The Group and the Consortium could avoid this mutual financial disaster by cooperating in securing a particular tax treatment of a refinancing and restructuring. Securing that treatment would likely involve a legal encounter with the IRS. Both appellants and the Consortium, therefore, had a strong common interest in the outcome of that legal encounter.

12

On this record, the nature and viability of the refinancing and restructuring had a commercial component and tax law component. Of course, the final transaction had to fit the need of the Schaeffler Group to conduct its business efficiently. Otherwise, the nature and viability of the transaction was driven by U.S. tax law, and both appellants and the Consortium had a common interest in seeing that law applied in a particular way. The documents in question were all directed to the tax issues, a legal problem albeit with commercial consequences, namely the possible insolvency of the Schaeffler Group and its default on the Consortium loan. Appellants' interest was in securing a refinancing. The Consortium's interest was in funding a refinancing that would protect its earlier investment and would itself be repaid, goals dependent on the resolution of legal tax issues. The fact that eleven-billion Euros of sunken investment and any additional sums advanced in the refinancing were at stake does not render those legal issues "commercial," and sharing communications relating to those legal issues is not a waiver of the privilege.

For example, when the possibility of default loomed, the Consortium's counsel became familiar with the Schaeffler Group's organizational structure and advised it during negotiations to restructure the Group and refinance its acquisition. The Consortium needed "access to confidential tax information and

analyses" to "assess its credit exposure for potential tax liabilities of Mr. Schaeffler."  J. App'x at 77.  Together, appellants and the Consortium agreed that Appellants should request an IRS private letter ruling.  With regard to issues not resolved by the letter ruling, they agreed to share "certain core tax advice prepared by the U.S. tax advisors."  J. App'x at 77.  This information was exchanged pursuant to the confidentiality agreement.

That this agreement, see Note 2, supra, involved the pursuit of a common legal strategy was reflected in the undertaking of mutual obligations involving appellants and the Consortium.  The Consortium agreed, subject to limitations not pertinent here, to permit Mr. Schaeffler to pay up to 885 million Euros in personal tax liabilities before repaying the Schaeffler Group's debt.  It further agreed to extend him an additional line of credit to pay tax liabilities up to 250 million Euros.  In return, Mr. Schaeffler's right to act unilaterally was restricted.  He was required to give notice to the Consortium of any material audit or investigation.  The Consortium also retained a right of refusal limiting Mr. Schaeffler's freedom of action with regard to the IRS, e.g. paying taxes, suing for a refund, or settling. The communications regarding tax opinions were, therefore, "made in the course of an ongoing common enterprise" and "intended to further the enterprise."  Schwimmer, 892 F.2d at 243.

14

The government's reliance on language in a number of cases from other circuits is misplaced. It is true that cases involving criminal prosecutions usually describe the definition of a common defense strategy according to the contours of a particular charging instrument. In the context of civil proceedings, however, these cases emphasized the need of the parties to identify a common legal interest or strategy in obtaining a particular legal goal whether or not litigation is ongoing. Such a mode of analysis is far more helpful to appellants than to the government. See, e.g., In re Pac. Pictures Corp., 679 F.3d 1121, 1129 (9th Cir. 2012) (holding that "victim" did not have common legal interest with the government due to a "shared desire to see the same outcome in a legal matter" -- i.e., a conviction; "[i]nstead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement -- whether written or unwritten"); United States v. BDO Seidman, LLP, 492 F.3d 806, 817 (7th Cir. 2007) (noting that "[c]ommunications do not cease to be for the purpose of receiving legal services just because the recipient intended to use the fruits of the legal services to guide [commercial transactions]" and that a memorandum constituting "a consultation between . . . in-house counsel and . . . outside counsel with respect to the legality of the proposed financial course of action" could fall under the common legal interest

15

doctrine); <u>Cavallaro v. United States</u>, 284 F.3d 236, 250 (1st Cir. 2002) (reaffirming that "when a client, a lawyer, and an accountant are present, the accountant's presence will destroy the privilege if the accountant is not necessary, or at least highly useful, for the effective consultation between the client and the lawyer") (quotation marks omitted).

No caselaw in this or another circuit compels us to hold that the Consortium's interest in appellants' obtaining favorable tax treatment for the refinancing and restructuring transaction is not a sufficient common legal interest. In our view, the fact that the Consortium stood to lose a lot of money (along with appellants) if appellants' tax arguments failed is not support for the position that no common legal interest existed. To the contrary, it was the interest in avoiding the losses that established a common legal interest. A financial interest of a party, no matter how large, does not preclude a court from finding a legal interest shared with another party where the legal aspects materially affect the financial interests.

For example, the Consortium's legal interest is underlined by the extent to which the Consortium essentially insured appellants, by extending credit and subordinating its debt, and retained control over Mr. Schaeffler's legal decisions to settle, pay, or sue. In that regard, several courts have held that an insurer shares a common legal interest with the insured in the

16

outcome of litigation, even when their potential defenses are not perfectly aligned.  See Lectrolarm Custom Sys., Inc. v. Pelco Sales, Inc., 212 F.R.D. 567, 571-73 (E.D. Cal. 2002); Travelers Cas. & Sur. Co. v. Excess Ins. Co., 197 F.R.D. 601, 607 (S.D. Ohio 2000) (holding that members of a reinsurance group facing similar environmental pollution claims by United States insurance and reinsurance companies "shared [legal] interests sufficiently common or joint to create a need for full and frank communication between and among counsel and their clients"); cf. Minn. Sch. Bds. Ass'n Ins. Trust v. Emp'rs Ins. Co. of Wausau, 183 F.R.D. 627, 631-32 (N.D. Ill. 1999) (holding, in the context of work product protection, that a reinsured's communication with its reinsurers did not waive the protection because the reinsured "always intended and expected that their communications would remain confidential and protected from common adversaries").

We, therefore, conclude that appellants did not waive their attorney-client privilege.

c) Application of Work-Product Doctrine

Because the district court concluded that the work-product immunity, if applicable, was not waived, and the government has not sufficiently challenged that ruling on appeal, we address only the district court's view that the EY Tax Memo and related documents were not entitled to work-product protection.

Attorney work product is of course protected from discovery. See Hickman v. Taylor, 329 U.S. 495, 510-11 (1947); see also Fed. R. Civ. P. 26(b)(3). The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (internal quotation marks omitted). Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings. Id. at 1204. We review the district court's ruling on a work-product claim for abuse of discretion. See, e.g., Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1989).

The district court acknowledged that the EY Tax Memo was prepared at a time when appellants believed litigation was highly probably and contained analyses of the strengths, weaknesses, and likely outcomes of potential legal arguments. Nevertheless, the court found that appellants would have sought and received advice "created in essentially similar form" even if they had not anticipated litigation. J. App'x at 1755. On this ground, the court denied work-product protection.

Adlman is the governing precedent. It posited polar examples on a spectrum to help in determining whether documents should be deemed prepared "in anticipation of litigation" and

18

therefore subject to work-product protection.  At one end of the spectrum, a document will be protected if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." Adlman, 134 F.3d at 1202 (citations omitted).  At the other end, protection will be withheld from "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation."  Id. The district court's application of the "ordinary course of business" or "essentially similar form" example to the documents at issue in this appeal appears to us to virtually swallow the work-product protection Adlman extended to documents "prepared or obtained because of the prospect of litigation."

Adlman held that work-product protection would be withheld only from documents that were prepared in the ordinary course of business in a form that would not vary regardless of whether litigation was expected.  In the present case, such records would include the supporting records and papers that appellants' external tax return preparers collected and created in the ordinary course of annually completing appellants' federal tax returns.[4]

---

[4] The government's reference to United States v. Frederick, 182 F.3d 496, 501-02 (7th Cir. 1999), as support for its position, is unpersuasive in the context of this appeal.  Frederick denied protection to "dual purpose" documents prepared by the appellant's lawyer, who was also his tax preparer, on the ground that "people in or

19

The tax advice in the EY Tax Memo was quite different. It was specifically aimed at addressing the urgent circumstances arising from the need for a refinancing and restructuring and was necessarily geared to an anticipated audit and subsequent litigation, which was on this record highly likely. See Adlman, 134 F.3d at 1195 (predicted litigation was virtually inevitable because of size of transaction and losses).

We also disagree with the district court's characterization of the form of the advice EY would be ethically and legally required to give appellants even in the absence of anticipated litigation. Neither professional standards, tax laws, nor IRS regulations required that appellants' tax advisors provide the kind of highly detailed, litigation-focused analysis and advice included in the EY Tax Memo. Cf. id. at 1195 (noting extraordinary detail in 58-page memorandum). The standards relied upon by the district court all target concerns over the "audit lottery," in which aggressive tax advisers might recommend risky tax positions solely because the particular clients were statistically unlikely ever to be audited. See ABA Formal Op. 85-352 (1985) (establishing a governing standard requiring

---

contemplating litigation [should not] be able to invoke, in effect, an accountant's privilege, provided that they used their lawyer to fill out their tax returns." Id. at 501. However, the court further noted that legal advocacy during an audit would be different from preparations of annual tax returns, and "[i]f, however, the taxpayer is accompanied to [an] audit by a lawyer who is there to deal with issues of statutory interpretation or case law that the revenue agent may have raised in connection with his examination of the taxpayer's return, the lawyer is doing lawyer's work and the attorney-client privilege may attach." Id. at 502.

lawyers to advise clients whether a position is likely to withstand litigation).  That policy concern is simply not implicated here where appellants would not have sought the same level of detail if merely preparing an annual routine tax return with no particular prospect of litigation.

Finally, we address the district court's construct of a hypothetical scenario in which appellants faced exactly the same business and tax issues but did not anticipate litigation.  This scenario appears to us to ignore reality.  The size of a transaction and the complexity and ambiguity of the appropriate tax treatment are important variables that govern the probability of the IRS's heightened scrutiny and, therefore, the likelihood of litigation.  To hypothesize the same size of the transaction and the same complexity and ambiguity of the tax issues but also a lack of any anticipation of litigation posits a factual situation at odds with reality.  It posits an expectation of harmony with the IRS similar to that associated with the preparation of a W-2 form in writing memoranda needed for large transactions with no clear application of the tax laws.

Finally, we note that the district court's holding appears to imply that tax analyses and opinions created to assist in large, complex transactions with uncertain tax consequences can never have work-product protection from IRS subpoenas.  This is contrary to Adlman, which explicitly embraces the dual-purpose

21

doctrine that a document is eligible for work-product protection "if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation[,]' Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)." Adlman, 134 F.3d at 1202.

In our view, the EY Tax Memo contains "legal analysis that falls squarely within [Hickman v. Taylor, 329 U.S. 495 (1947)]'s area of primary concern-analysis that candidly discusses the attorney's litigation strategies [and] appraisal of likelihood of success." Id. at 1200. They are, therefore, protected under the work-product doctrine.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court and remand for such further proceedings as may be necessary to determine, in a manner consistent with this opinion, whether any remaining documents are protected by the attorney-client privilege or work-product doctrine.