**CERTAIN UNDERWRITERS AT LLOYD'S, et al., Plaintiffs,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, et al., Defendants.**

14–CV–4717 (FB)

United States District Court, E.D. New York.

Signed February 19, 2016

Joseph L. Ruby, Mark J. Leimkuhler, Martin R. Baach, Lewis Baach PLLC, Washington, DC, Ronald Abramson, Lewis Baach PLLC, New York, NY, for Plaintiffs.

Europeesche Verzekering Maatschappij NV, pro se.

Excess Insurance Company Limited, pro se.

Helvetia–Accident Swiss Insurance Company (as Part of Gibbon "E" Group), pro se.

Gresham Fire & Accident Insurance Society Limited, pro se.

Gresham Insurance Society Limited, pro se.

David L. Elkind, Lowenstein Sandler LLP, Rhonda D. Orin, Daniel John Healy, Anderson Kill & Olick LLP, Angela Singleton, Orrick, Herrington & Sutcliffe LLP, Richard Bryan, Kristen Vine, Jackson & Campbell, P.C., Katherine Hance, Shipman & Goodwin LLP, Washington, DC, Benjamin David Tievsky, Lowenstein Sandler LLP, Vivian Costandy Michael, Anderson Kill, Vincent J. Velardo, Litchfield Cavo LLP, Jeffrey Steven Kramer, Joseph N. Froehlich, Locke Lord LLP, William Patrick Lalor, Elenius Frost & Walsh, Nicholas Anthony Corsano, Hinshaw & Culbertson LLP, Steven J. Fried, Clausen Miller PC, Whitney Morgan Smith, Cahill Gordon and Reindel, New York, NY, Anthony R. Gambardella, Lawrence Adam Levy, Michael A. Kotula, Robert A. Maloney, Rivkin Radler LLP, Uniondale, NY, Steven Gary Adams, Law Offices of Michael F. Klag, Brooklyn, NY, William Eugene McGrath Jr., Smith Stratton, Princeton, NJ, Brian Michael Reid, Litchfield Cavo LLP, Ernesto Palomo, Locke Lord LLP, Robert A. Badgley, Karbal, Cohen, Economou, Silk, Dunne, LLC, Kathryn M. Frost, Elenius Frost & Walsh, Elizabeth T. Jozefowicz, Mark W. Zimmerman, Elise D. Allen, Clausen Miller P.C., Chicago, IL, John S. Favate, Arthur A. Povelones, George Richard Hardin, Hardin, Kundla, McKeon & Poletto, Springfield, NJ, Robert P. Siegel, Traub, Lieberman, Straus & Shrewsberry, LLP, Hawthorne, NY, Alison P. Baker, Shipman and Goodwin LLP, Stamford, CT, Claude N. Grammatico, Epstein, Gialleonardo, Frankini, Mineola, NY, Kristin S. Heres, Wm. Gerald McElroy, Jr., Zelle, Hofmann, Voelbel & Mason, LLP, Framingham, MA, for Defendants.

### *MEMORANDUM AND ORDER*

ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE

In this declaratory judgment action, plaintiff-insurers seek, *inter alia,* a determination as to whether a series of liability

insurance policies, issued to defendant National Railroad Passenger Corporation ("Amtrak") more than three decades ago, obligates plaintiff-insurers to reimburse Amtrak for costs incurred in connection with environmental waste allegedly found on Amtrak's property. *See* Amended Complaint (Nov. 11, 2014) ("Am.Compl.") ¶¶ 1–2, Electronic Case Filing Docket Entry ("DE") # 111; Amtrak Amended Answer (Dec. 30, 2015), DE # 277.

Currently pending before the Court are cross-motions to compel discovery. *See* Amtrak's Motion to Compel (Nov. 23, 2015), DE # 256; Plaintiffs' Motion to Compel (Nov. 23, 2015), DE # 255. One of the many discovery disputes at issue is whether attorney-client communications listed on certain insurers' privilege logs are protected from disclosure even though, due to the unique structure of the London insurance market, those communications were shared with third parties. Another dispute is whether the plaintiff-insurers' privilege log adequately identifies the parties to the allegedly privileged communications. For the reasons explained below, the Court concludes that the insurers have failed in their burden to establish that the attorney-client privilege protects the aforesaid categories of documents from discovery and therefore grants those aspects of Amtrak's motion to compel.

## BACKGROUND

Plaintiffs in this action are insurers who "did business in the London Insurance Market and who issued or participated in—that is, subscribed to an agreed percentage share of the risk of—" one or more liability insurance policies issued to Amtrak during the period beginning on or about June 1, 1972 and ending in 1986 (the "Policies"). *See* Am. Compl. ¶¶ 1–2.[1] According to the Amended Complaint, due to certain environmental contaminations and/or asbestos exposure, Amtrak demanded coverage under the Policies. *See id.* ¶¶ 7–8. Thereafter, the parties entered into a standstill agreement, and, for many years, attempted to settle the coverage issue in good faith. *See id.* ¶¶ 9–11. In or around 2014, however, Amtrak notified LMI that it wished to terminate the standstill agreement, and this action followed. *See id.* ¶ 11.

## I. The London Insurance Market

Before addressing the privilege dispute before the Court, it is helpful to provide background on how the London insurance market operated during the relevant time period. In support of its opposition, LMI has submitted the declaration of Martin Watson, who claims to have knowledge on the customs and practices of the London insurance market from the 1980s through the present day, based on his experience in that market. *See* Declaration of Martin Watson ("Watson Decl.") ¶¶ 2–4, DE # 266-3. According to Watson, a policy for a major corporation like Amtrak would involve "insurance placed in layers, each policy attaching at the exhaustion point of the underlying policy." *Id.* ¶ 6. Thus, "[a]n insurer might participate in multiple layers at different percentage shares, or might participate on only on [sic] one." *Id.* "A single policy might have anywhere from one or two insurers or dozens of insurers."

---

1. Plaintiffs are collectively referred to herein as the London Market Insurers ("LMI"). A full list of the insurers is set forth in both the caption and Attachment A to the Amended Complaint. *See* Am. Compl. ¶ 2; Attachment A, DE # 111 at 38–40. Notably, not all insurers who participated in the Policies are plaintiffs in this action; indeed, some (including several involved in the instant dispute, *see infra* p. 5 n.2) have been named as defendants, *see* Am. Compl. ¶ 5, and additional insurers have been named as third-party defendants, *see generally* Third Party Complaint (Dec. 30, 2015), DE # 278.

*Id.* ¶ 7. As such, each policy typically had "one or two 'lead' insurers, whose underwriters negotiated policy terms and conditions[.]" *Id.* ¶ 8.

To place its insurance in the London market, Amtrak, through its North American-based insurance broker, engaged two London brokers—Sedgwick and C.E. Heath ("Heath"). *See* Watson Decl. ¶ 10. According to LMI's counsel, the London broker would take Amtrak's insurance order and walk around to the various syndicates and companies in the London insurance market to "fill up" the policy. *See* Transcript of Civil Hearing (Jan. 29, 2016) ("1/29/16 Tr.") at 128–29, DE # 309; *see also id.* at 137 ("[T]he broker that represented Amtrak walked into the room at Lloyd's ... and got the active underwriters to take shares[.]"); Watson Decl. ¶ 10 (Amtrak's London broker Heath "placed several shares of policies with insurers based in Europe, Latin America and the Far East").

The London brokers did not, however, take action only on behalf of Amtrak. As Watson explains:

> With so many insurers, each with its own claims personnel, a system of communication grew up in the pre-computer age that enabled the market to handle claims promptly and efficiently. This system utilized the London broker, which had negotiated with each insurer and maintained the records of each insurer's participation on each policy, to serve as a conduit for information *among the insurers.*

Watson Decl. ¶ 12 (emphasis added).

Important to the instant dispute, this "London broker" message delivery system also applied to communications between the insurers and their attorneys. According to Watson, "[t]he attorneys for 'the market'—that is, for the insurers on a policy or a program of policies subscribed in favor of a particular [insured]—did not communicate directly with all the members of a market." Watson Decl. ¶ 14. Rather, the attorneys "communicated with the lead underwriter, and relied on the [London] broker to make their reports available to all the subscribers on a policy who were represented by such counsel." *Id.* The attorneys used terms like "Insurers at Interest," "Interested Underwriters," or "Subscribing Insurers" on those reports to indicate that "all insurers subscribing to the [insured's] policies implicated in a loss and represented by such counsel had a right to review the communication." *Id.*

Notably, in the 1980s and 1990s, "insurers in the London Market" retained U.S. law firms such as Lord Bissell & Brook ("LBB") to advise them on environmental, asbestos and health hazard claims. *See* Watson Decl. ¶ 15. These U.S. lawyers would send attorney reports (hereinafter, the "Attorney Reports") "to a servicing company for the London Market—either to Toplis & Harding, Ltd. ('Toplis'), or to London Market Claims Services, Ltd. ('LMCS')." *Id.* These servicing companies would then forward the Attorney Reports to the London brokers, "who placed them in a claim file for distribution to the participating insurers." *Id.* The London brokers then "sent messengers to walk the claims file around the market to the various claims handlers representing [the] individual syndicates or companies, who would review it, if they wished to." *Id.* ¶ 16. According to Watson, "[t]he file was then returned to the broker's office." *Id.*

## II. Amtrak's Motion to Compel

In its motion, Amtrak challenges LMI's privilege log in two respects. *See* Amtrak Memorandum of Law in Support of Its Cross–Motion to Compel (Nov. 23, 2015) ("Amtrak Mem.") at 8, DE # 256–1; LMI Privilege Log ("LMI Log"), DE # 256–84.

First, Amtrak claims that, because the London brokers were neither attorneys nor clients, the distribution of communications from LMI's attorneys (including the Attorney Reports) through the London brokers waived any privilege.[2] See *id.* Second, Amtrak alleges that by referring to "Underwriters at Interest," "Interested Insurers," or "Subscribing Insurers," the LMI Log inadequately identifies recipients of attorney communications. *See id.*

In opposition, LMI argues that using brokers to distribute privileged communications was "standard" in the London market and not understood to waive the privilege. *See* Memorandum in Opposition (Dec. 17, 2015) ("LMI Opp.") at 7, DE # 266; [Wausau and Nationwide] Response in Opposition (Dec. 17, 2015) at 1, DE # 264 (joining in the LMI opposition brief as to the broker waiver issue). With respect to the sufficiency of the LMI Log's identification of the recipients, LMI contends that the participating insurers shared a "common interest in resolving issues correctly and as efficiently as possible and for that reason were represented by the same counsel with respect to Amtrak's claim." LMI Opp. at 7.

On February 2, 2016, the Court heard oral argument on the attorney-client privilege issues raised in Amtrak's motion. *See* Transcript of Hearing (Feb. 2, 2016) ("2/2/16 Tr."), DE # 310. During the conference, LMI acknowledged that its position with respect to attorney-client communications that were sent through the London brokers was "counterintuitive to an American court and to American law," but argued that it was "a recognized practice [for] a broker ... to distribute communications to the underwriters on the policy." *Id.* at 20. With respect to the sufficiency of the identification of the recipients of these communications, LMI argued that Watson's explanation of the meaning of terms like "Interested Underwriters" satisfied LMI's burden as proponent of the attorney-client privilege. *See id.* at 17–18, 20. Finally, during the oral argument, Amtrak raised a new argument with respect to the Attorney Reports—namely, that those reports were not created for the purpose of providing legal advice, but, rather, were part of the routine claims handling process. *See id.* at 6, 8, 31.

## DISCUSSION

### I. Legal Standard

 Under federal common law,[3] a party seeking to withhold discovery on the

---

**2.** Amtrak makes this argument with respect to the LMI Log, as well as the joint privilege log of defendant insurers Wausau International Underwriters ("Wausau") and Nationwide Mutual Insurance Company ("Nationwide"). *See* Amtrak Mem. at 8; *see generally* Wausau and Nationwide Privilege Log, DE # 257–1.

**3.** LMI brings this action pursuant to this Court's federal question jurisdiction. *See* Am. Comp. ¶ 67 (citing 28 U.S.C. § 1331 and 28 U.S.C. § 1349). Thus, the Court applies federal common law to the privilege issues implicated in the instant motion. *See, e.g., von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987); *Wultz v. Bank of China Ltd.,* 304 F.R.D. 384, 390 (S.D.N.Y.2015); *Asuncion v. Metro. Life Ins. Co.,* 493 F.Supp.2d 716, 720

(S.D.N.Y.2007); *cf. Am. Nat'l Red Cross v. S.G.,* 505 U.S. 247, 251, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992) (noting that cases brought against federally chartered corporations pursuant to 28 U.S.C. § 1349 are considered to " 'aris[e] under' federal law for purposes of general statutory federal-question jurisdiction"); *Wyant v. Nat'l R.R. Passenger Corp.,* 881 F.Supp. 919, 924 (S.D.N.Y.1995) ("Amtrak is correct that the law is well-settled that federal courts have federal question jurisdiction over suits by or against Amtrak under 28 U.S.C. § 1331.") (collecting cases); *see also* Joint Status Report (Jan. 15, 2016), DE # 285 ("The parties agree that the issues briefed are subject to the Federal Rules of Civil Procedure and Federal Rules of Evidence.").

basis of the attorney-client privilege must demonstrate that the communications at issue were (1) between a client and his or her attorney; (2) intended to be, and in fact were, kept confidential; and (3) for the purpose of obtaining or providing legal advice. *See United States v. Mejia*, 655 F.3d 126, 132 (2d Cir.2011); *see also Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir.2015). "The purpose of the attorney-client privilege is to enable attorneys to give informed legal advice to clients, which would be undermined if an attorney had to caution a client about revealing relevant circumstances lest the attorney later be compelled to disclose those circumstances." *Schaeffler*, 806 F.3d at 40.

▮ "A party that shares otherwise privileged communications with an outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential." *Schaeffler*, 806 F.3d at 40. This is not to say that every communication shared with a third party automatically loses its privileged status. For example, "[t]he existence of a third party somewhere along the line of communication 'does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client.'" *Mejia*, 655 F.3d at 134 (quoting *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir.1999)). Nor is the privilege destroyed when a communication is voluntarily disclosed to a third party "that is engaged in a 'common legal enterprise' with the holder of the privilege." *Schaeffler*, 806 F.3d at 40 (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989)).

▮ Because sustaining a claim of privilege renders otherwise relevant information undiscoverable, federal courts apply and construe privilege doctrine narrowly. *See Wultz v. Bank of China Ltd.*,

304 F.R.D. 384, 390–91 (S.D.N.Y.2015) (citing *Mejia*, 655 F.3d at 132). The party asserting the privilege bears the burden of establishing all the necessary elements. *Mejia*, 655 F.3d at 132 (citing *von Bulow*, 811 F.2d at 144). The proponent's burden is "not discharged by mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224–25 (2d Cir.1984) (citation and internal quotation marks omitted); *accord In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 184 (2d Cir.2007); *Wultz*, 304 F.R.D. at 391.

## II. Application of Legal Standard to the Facts

### A. Attorney–Client Communications Distributed through London Brokers

▮ As stated above, under certain circumstances, a third party may be privy to attorney-client communications without destroying the protection afforded by the attorney-client privilege. *See Mejia*, 655 F.3d at 134. In particular, courts have held that the presence of third parties who are agents of the lawyer or client and whose participation "improve[s] the comprehension of the communications between attorney and client" does not negate the privilege. *See Ackert*, 169 F.3d at 139. Thus, communications from a client to a third-party accountant or foreign-language translator hired to assist a lawyer in providing legal advice to that client are protected under the privilege. *See United States v. Kovel*, 296 F.2d 918, 921–22 (2d Cir.1961). Here, however, nothing in the record suggests that the London brokers served any analogous role. Rather, it appears that the London brokers acted as nothing more than an intermediary or clearing house for the Policies. *See In re Application Pursuant to 28 U.S.C. § 1782 for an Order Permitting Christen Sveaas*

*to Take Discovery . . .*, 249 F.R.D. 96, 101–02 (S.D.N.Y.2008) (in holding that a non-party art broker did not come within the *Kovel* exception to waiver of the privilege by third-party disclosure, court noted that where the law firm using the broker did not require the broker to explain or clarify contract negotiations and/or legal ramifications of foreign proceedings, the broker, while perhaps "useful," was "not necessary" to the furnishing of legal advice).

The thrust of LMI's arguments with respect to attorney-client communications sent through the London brokers is that such a practice was "standard" and "necessary" given the London market's structure. *See* LMI· Opp. at 7 (citing Watson Decl. ¶ 15). LMI's position is unavailing for several reasons. First, the fact that a particular method of distributing and/or retaining documents is standard in an industry does not determine whether that method of distribution comports with the law governing attorney-client privilege. *See In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, MDL No. 764, 1990 WL 139403, at *5 (E.D.Pa. Sept. 19, 1990) ("[T]he unique functioning of the London insurance market does not obviate the need to follow the American rules of court.") (holding attorney communications that were circulated to insurers through third-party brokers were not protected by the attorney-client privilege).[4]

Second, although LMI characterizes the utilization of the London brokers as a necessity, *see* LMI Opp. at 7, there is nothing in the record to support a finding that this was the only method by which the U.S. lawyers could communicate with the relevant insurers—save for a conclusory and ambiguous statement made in the Watson Declaration that this method was the "only way possible[,]" *see* Watson Decl. ¶ 14; *see also* discussion *infra* p. 11 n.5; *cf. Mejia*, 655 F.3d at 133–34 (where prisoner could have availed himself of other means of communicating with his attorney rather than speaking with his sister on a recorded prison phone line, prisoner failed to establish that communication was intended to be kept confidential). LMI's burden cannot be met by such flimsy and unsupported claims of necessity. *See United States v. Gotti*, 771 F.Supp. 535, 542 (E.D.N.Y.1991) ("If it is claimed that the presence of the third party is necessary, the defendant bears the burden of proving it.").

Indeed, while the Watson Declaration expressly states that LLB, LMI's U.S. counsel, would send Attorney Reports to "servicing compan[ies] for the London Market," such as Toplis or LMCS, *see* Watson Decl. ¶ 15, LMI proffers no information as to whether it was LBB that retained the services of the London brokers on behalf of the insurers; nor is it clear that LBB was even aware that the servicing companies had included the Lon-

---

4. To be sure, LMI cites an unpublished 1995 New York State Supreme Court opinion, in which a court affirmed a special referee's finding that the London broker method of distribution did not waive the attorney-client privilege. *See Occidental Chem. v. Hartford-Accident & Indem. Co.* (N.Y. Sup. Niagara Co. Mar. 22, 1995) (the *"Occidental* Opinion"), DE # 266–4. The *Occidental* court based its opinion, in part, on the "limited and ministerial" nature of the broker's role. *See Occidental* Opinion at 7, DE # 266–4 at 9. As noted above, *see supra* p. 7 n.3, New York law

does not govern the privilege issues before the Court and, in any event, even if it did, the *Occidental* Opinion does not address the necessity of the practice—one of the elements of the agency exception to waiver of the attorney-client privilege. *See Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 430–31 (S.D.N.Y. 2013). Moreover, the opinion in *Occidental* is silent as to the evidentiary submissions presented to that court, which may well have been more substantial than the showing made in the instant case. For all of these reasons, this Court declines to follow *Occidental*.

don brokers in particular distribution chains.[5] The record is similarly deficient with respect to the extent of the brokers' agency relationship with the various insurers. *Cf. La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F.Supp.3d 358, 365–67 (S.D.N.Y.2014) (holding that, because attorney failed to establish that insurance broker had an agency relationship with insurance policyholders—the attorney's former clients—communications between attorney and broker were not privileged); *Fifty–Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV. 6143(DLC), 2010 WL 343490, at *1–2 (S.D.N.Y. Feb. 1, 2010) (holding that a conclusory affidavit was insufficient to establish an agency relationship between plaintiffs and a non-party who purportedly had acted as their representative).

The lack of evidence as to the necessity for the role played by the London brokers, as well as to the exact nature of their relationship with the attorneys and/or insurers, is particularly troubling given the dual agency of the London brokers, who represented *Amtrak* during the negotiation over and purchase of the Policies.[6] *See* 1/29/16 Tr. at 137; *cf. In re Application Pursuant to 28 U.S.C. § 1782*, 249 F.R.D. at 101 (rejecting art broker's assertion that she acted as an agent of purchaser of painting for purposes of privilege, where the facts indicated she acted "as a broker who worked for both parties to facilitate the sale" and whose role was "that of [an] intermediary").

Moreover, the record contains no evidence whatsoever regarding the confidential treatment of the Attorney Reports or other communications through the London brokers, such as whether the Attorney Reports were stamped confidential or what precautions were taken to ensure that those communications remained confidential. *Cf.* 2/2/16 Tr. at 23 (noting that Watson cannot say whether he saw one of the Attorney Reports during the period he worked in the London insurance market). Watson states that "[t]he use of the broker to assist in [the] distribution [of the Attorney Reports], to [his] understanding and, to [his] experience as a former claims broker, was not intended to and did not waive any privilege that otherwise attached to such documents." Watson Decl. ¶ 17. His conclusory assumption is no substitute for a declaration or evidence from the attorneys or from any other witness in a position to address the requisite elements of privilege. *See generally John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 17

---

**5.** The ambiguous and imprecise language of paragraph 14 of the Watson Declaration obscures rather than clarifies what the attorneys understood vis-à-vis the broker delivery system. For example, while paragraph 14 states, in part, that once the lead underwriters retained counsel, "communication was sent by the only way possible" (i.e., through the broker), Watson fails to explain exactly what types of communications were sent or by whom. *See* Watson Decl. ¶ 14. Moreover, the Court questions Watson's competence to opine as to whether the U.S. lawyers did, in fact, rely on the brokers—as opposed to servicing companies such as Toplis—to distribute their reports. Most of the entries on the LMI Log do not even reference a broker. *See, e.g.,* LMI Log at 1 (listing several LLB reports as having been sent care of Toplis, with no mention of a London broker).

**6.** During oral argument, LMI's counsel emphasized that the documents for which the insurers are claiming privilege were not generated until *after* the London brokers ceased placing general liability policies on Amtrak's behalf. *See* 2/2/16 Tr. at 21–22. But counsel's argument is unsupported by competent evidence detailing the beginning, end, or scope of the brokers' agency relationship with Amtrak. In any event, however disturbing the practice of having a dual agent act as the conduit for attorney-client communications, the Court's decision herein does not turn on the dual nature of the London broker.

F.Supp.3d 400, 404–05 (S.D.N.Y.2014) (noting that the elements of privilege are typically established through sworn statements). Although LMI is of the opinion that one sentence in a declaration is sufficient to establish the privileged and confidential nature of documents, *see* 2/2/16 Tr. at 23, this Court disagrees. *See In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d at 224–25 (the burden of a party asserting a privilege is "not discharged by mere conclusory or ipse dixit assertions").

For these reasons, the Court concludes that LMI, Wausau, and Nationwide have failed to establish that attorney-client communications like the Attorney Reports that were distributed through and/or retained by the London brokers were intended to be, and were in fact, kept confidential.[7] LMI, Wausau, and Nationwide are directed to produce these documents to Amtrak no later than March 7, 2016.[8]

## B. Identification of Certain Recipients of Attorney Communications

 In a separate argument, Amtrak moves to compel the production of documents listed on LMI's privilege log that are addressed to "Underwriters at Interest," "Interested Underwriters," or "Subscribing Insurers" (collectively, at times, the "Recipient Descriptions"). *See* Amtrak Mem. at 8.[9] In essence, Amtrak argues that it cannot ascertain who received allegedly privileged communications such as the Attorney Reports and whether those recipients were, in fact, clients of the attorney sending the communication and/or had a common legal interest with LMI. *See, e.g.,* 2/2/16 Tr. at 11 ("[W]e're dealing with this amorphous group of unknown parties that have been referred to as ['] interested insurers.['] We don't know who that constitutes.").

In opposition, LMI points to the Watson Declaration, wherein Watson explains that the Recipient Descriptions refer "to insurers who participated in a share of one or more Amtrak policies." LMI Opp. at 7 (citing Watson Decl. ¶ 14). LMI argues that all of the insurers who underwrote the Policies "had a common interest in resolving coverage issues correctly and as efficiently as possible and for that reason were represented by the same counsel with respect to Amtrak's claims." LMI Opp. at 7 (citing *Schaeffler*, 806 F.3d at 40).

---

7. Because the Court concludes that these documents must be produced, there is no need to address Amtrak's belated argument, raised during the hearing, that the Attorney Reports were not created for the purpose of rendering legal advice, and thus did not qualify as privileged. *See* 2/2/16 Tr. at 31 (acknowledging that Amtrak failed to argue, in its motion papers, "that the [ ] lawyers were acting as claim handlers"). In addition, the Court concludes that, although LMI's opposition and the Watson Declaration mention the role of other third parties (such as servicing companies LMCS and Toplis), Amtrak's motion and argument with respect to waiver of the privilege are limited to communications involving the London brokers. *See* Amtrak Mem. at 8; 2/2/16 Tr. at 13 ("To the extent [attorney communications] were sent through brokers, [Amtrak] would have the same argument as well."); *see also id.* at 28 (noting that "Am-

trak does not assert that Toplis and Harding or LMCS don't come within the umbrella of the privilege as agents for the insurers for the purpose of distributing the documents.").

8. Although Amtrak noted during oral argument that similar documents are found on the privilege log created by defendant Century Indemnity Company ("Century"), *see* 2/2/16 Tr. at 12, Amtrak failed to raise this issue in its motion papers, and, therefore, the Court does not now direct Century to produce documents on its log. *See* Amtrak Mem. at 6 (discussing other challenge to Century's log).

9. Some but not necessarily all of these documents were apparently sent through London brokers and are thus discoverable on that independent ground.

Even assuming that LMI shared a common legal interest with other insurers on the same Policies, LMI's failure to identify the specific recipients of the logged documents is fatal to LMI's claim of attorney-client privilege and the common interest exception to the waiver doctrine. *Cf. Int'l Surplus Lines Ins. Co. v. Willis Corroon Corp.*, No. 91 C 6057, 1992 WL 345051, at *7 (N.D.Ill. Nov. 12, 1992) (holding that documents addressed to "Interested Insurers" were "too widely disseminated" to satisfy the prerequisites of the attorney-client privilege, where, *inter alia*, the "scope" of the distribution was "essentially undefined"); *Hatco Corp. v. W.R. Grace & Co.-Conn.*, Civ. a. No. 89–1031, 1991 WL 83126, at *2 (D.N.J. May 10, 1991) (affirming Special Master's determination that the London Market Insurers did not meet their burden of "proving that each person or entity to which [legal] memoranda were sent was a client of one of the six American [law] firms at the time they were sent"); *see also Fine v. ESPN, Inc.*, No. 5:12–CV–0836 (LEK/DEP), 2015 WL 3447690, at *12 (N.D.N.Y. May 28, 2015) (affirming magistrate judge's rejection of common interest privilege between a university and its Board of Trustees: even though university claimed that each recipient of the disputed communications was within the common interest privilege, university failed to identify which recipients were members of the Board, depriving the court of sufficient information with which to determine whether the common interest privilege applied) (applying both New York and federal law); *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 23 (W.D.N.Y.1997) (concluding that sworn statements by plaintiffs' counsel that, to the best of their knowledge, meeting agendas addressed to "Pfohl Area Homeowners and Residents Coalition," "former and current residents of the Pfohl Road Landfill" and the "Pfohl Coalition" were distributed only to clients were insufficient to establish the elements of attorney-client privilege, where plaintiffs did not proffer distribution lists or attendance sheets from the meetings for which agendas were prepared).

Essentially, LMI asks this Court to simply trust, in a vacuum, that only the appropriate parties were privy to these communications. *See* 2/2/16 Tr. at 18 ("It is true that we cannot list for you, Your Honor, every insurer who looked at the communication."). Moreover, LMI's contention that the Watson Declaration satisfies LMI's evidentiary burden is unpersuasive. *See id.* at 17–18. While LMI states that it is unable to retrieve this information unless Amtrak agrees to a joint request from the broker, *see id.* at 18–19, there is nothing in the record to suggest that LMI tried to retrieve similar information from the law firm sending these communications, or from their servicing companies (Toplis and LMCS). Surely, LBB, or its successor firm, Lord Locke, should have maintained a contemporaneous record of which insurers it represented for purposes of the Policies and/or which parties were receiving its privileged communications.[10]

Therefore, the Court concludes that the insurers have not met their burden of establishing the factual predicate for withholding documents with unspecified Recipient Descriptions on the basis of attorney-client and common interest privilege. Therefore, LMI must produce those documents by March 7, 2016.

### CONCLUSION

For the reasons stated above, the Court grants that aspect of Amtrak's mo-

10. To the extent that they failed to do so, counsel's inability to identify their own "clients" further underscores the frailty of LMI's privilege claim.

tion to compel relating to (1) attorney-client communications that were distributed through or retained by third-party London brokers; and (2) attorney-client communications that were addressed to "Underwriters at Interest," "Interested Underwriters," "Subscribing Insurers" or other similarly vague descriptions. As discussed herein, LMI, Wausau and Nationwide are directed to produce those documents by March 7, 2016.

SO ORDERED.