This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 80
Ambac Assurance Corporation,
et al.,
          Appellants,
        v.
Countrywide Home Loans, Inc.,
et al.,
          Defendants,
Bank of America Corp.,
          Respondent.


          Stephen P. Younger, for appellants.
          Jonathan Rosenberg, for respondent.
          New York State Trial Lawyers Association; New York
State Academy of Trial Lawyers; Chamber of Commerce of the United
States of America et al., amici curiae.




PIGOTT, J.:

          This discovery dispute involves certain attorney-client

communications that defendant Bank of America Corporation and

defendant Countrywide Financial Corporation shared when the two

entities were in the process of merging.  Generally,

communications between an attorney and a client that are made in

- 1 -

the presence of or subsequently disclosed to third parties are not protected by the attorney-client privilege. Under the common interest doctrine, however, an attorney-client communication that is disclosed to a third party remains privileged if the third party shares a common legal interest with the client who made the communication and the communication is made in furtherance of that common legal interest. We hold today, as the courts in New York have held for over two decades, that any such communication must also relate to litigation, either pending or anticipated, in order for the exception to apply.

I.

Plaintiff Ambac Assurance Corporation is a monoline insurer that guaranteed payments on certain residential mortgage-backed securities issued by defendant Countrywide Home Loans, Inc., a wholly-owned subsidiary of Countrywide Financial Corporation (referred to collectively in this appeal as "Countrywide"). When the mortgage-backed securities that Ambac insured failed during the recent financial crisis, Ambac commenced this action against Countrywide in Supreme Court alleging that Countrywide breached contractual representations, fraudulently misrepresented the quality of the loans and fraudulently induced Ambac to guaranty them.

Ambac named Bank of America as a defendant in the action, based on its merger with Countrywide. The merger began to take shape in 2007, as Countrywide faced increasing credit

losses and negative expectations about its future performance.
The two entities publicly announced a merger plan on January 11,
2008 and closed on July 1, 2008.  As a result of the merger,
Countrywide sold substantially all of its assets to Bank of
America through a series of asset transfers, and Countrywide
merged into a wholly-owned subsidiary of Bank of America called
Red Oak Merger Corporation.  Ambac alleged that, as a result of
the merger, Bank of America became Countrywide's successor-in-
interest and alter ego and was responsible for Countrywide's
liabilities to Ambac in the underlying action for fraud.

Discovery ensued, and in November 2012, Ambac
challenged Bank of America's withholding of approximately 400
communications that took place between Bank of America and
Countrywide after the signing of the merger plan in January 2008
but before the merger closed in July.  Bank of America had listed
the communications on a privilege log and claimed they were
protected from disclosure by the attorney-client privilege
because they pertained to a number of legal issues the two
companies needed to resolve jointly in anticipation of the merger
closing, such as filing disclosures, securing regulatory
approvals, reviewing contractual obligations to third parties,
maintaining employee benefit plans and obtaining legal advice on
state and federal tax consequences.  Although the parties were
represented by separate counsel, the merger agreement directed
them to share privileged information related to these pre-closing

legal issues and purported to protect the information from outside disclosure.  Bank of America argued that the merger agreement evidenced the parties' shared legal interest in the merger's "successful completion" as well as their commitment to confidentiality, and therefore shielded the relevant communications from discovery.

Ambac moved to compel production of those documents, arguing that the voluntary sharing of confidential material before the merger closed waived any attorney-client privilege that might have otherwise attached.  According to Ambac, Bank of America and Countrywide waived the privilege because they were not affiliated entities at the time of disclosure and did not share a common legal interest in litigation or anticipated litigation.  Ambac further asserted that the allegedly privileged documents were relevant to its successor-in-interest and alter ego theories of liability and may have demonstrated that Bank of America structured the merger so as to conceal Countrywide's fraud and leave creditors without recourse.

A Special Referee appointed to handle privilege disputes issued a report on Ambac's motion and ordered the parties to review the remaining documents in accordance with its decision (2013 NY Slip Op 32568[U] [Sup Ct, NY County 2013]). The Referee explained that the exchange of privileged communications ordinarily constitutes a waiver of the attorney-client privilege and that the communications at issue would be

entitled to protection only if Bank of America could establish an exception to waiver. The Referee discussed one such exception, the common interest doctrine, which permits a limited disclosure of confidential communications to parties who share a common legal (as opposed to business or commercial) interest in pending or reasonably anticipated litigation (id. at *6, citing Aetna Cas. & Sur. Co. v Certain Underwriters at Lloyd's, London, 176 Misc 2d 605 [Sup Ct, NY County 1998], affd 263 AD2d 367 [1st Dept 1999]). The Referee concluded that "[i]f there is such litigation and a common legal interest then the common-interest doctrine comes into play. If there is not then the doctrine does not protect the document" (id. at *8 [emphasis in original]). Having announced this standard, the Referee instructed the parties to review the withheld documents, update the privilege log and submit any documents that remained in dispute for in camera review (id. at *9).

Bank of America moved to vacate the Referee's decision and order on the ground that its communications with Countrywide were protected by the attorney-client privilege even in the absence of pending or anticipated litigation. According to Bank of America, the items were privileged so long as they involved matters of a common legal interest between the parties -- i.e., closing the merger -- and were otherwise protected by the attorney-client privilege. Supreme Court denied the motion, holding that New York law "requires that there be a reasonable

anticipation of litigation" in order for the common interest doctrine to apply (41 Misc 3d 1213[A], 2013 NY Slip Op 51673[U] [Sup Ct, NY County 2013]).

Bank of America appealed, and the Appellate Division reversed, granted the motion to vacate and remanded for further proceedings (124 AD3d 129 [1st Dept 2014]).  Although the court recognized that, historically, "New York courts have taken a narrow view of the common-interest [doctrine], holding that it applies only with respect to legal advice in pending or reasonably anticipated litigation," it was unpersuaded by the reasoning of those courts and concluded that pending or reasonably anticipated litigation was no longer a necessary element of the exception (id. at 129).  The court observed that "when a single party seeks advice from counsel, the communication is privileged regardless of whether litigation is within anyone's contemplation" but that, under Supreme Court's formulation of the doctrine, "when two parties with a common legal interest seek advice from counsel together, the communication is not privileged unless litigation is within the parties' contemplation" (id. at 135-136).  The Appellate Division could not reconcile that distinction with the purposes underlying the attorney-client privilege and decided instead to follow the federal courts that have "overwhelmingly rejected [a litigation] requirement" (id. at 134 [citing cases from the Second, Third, Seventh and Federal Circuit Courts of Appeals]).  The Appellate Division remanded the

matter to the Special Referee to determine whether the communications fell within its reformulation of the rule.  It subsequently granted Ambac leave to appeal to this Court, certifying the following question: "Was the order of this Court, which reversed the order of Supreme Court, properly made?"

II.

A.  The Attorney-Client Privilege

The attorney-client privilege shields from disclosure any confidential communications between an attorney and his or her client made for the purpose of obtaining or facilitating legal advice in the course of a professional relationship (see CPLR 4503[a][1]).  The oldest among the common law evidentiary privileges, the attorney-client privilege "fosters the open dialogue between lawyer and client that is deemed essential to effective representation" (Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 377 [1991]).  "It exists to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment" (Matter of Priest v Hennessy, 51 NY2d 62, 67 [1980]).

Despite the social utility of the privilege, it is in "[o]bvious tension" with the policy of this State favoring liberal discovery (Spectrum, 78 NY2d at 376-377; see also CPLR 3101[a][1] [directing that there be "full disclosure of all matter material and necessary in the prosecution or defense of an

action"]).  Because the privilege shields from disclosure pertinent information and therefore "constitutes an 'obstacle' to the truth-finding process," it must be narrowly construed (Matter of Jacqueline F., 47 NY2d 215, 219 [1979]; see Spectrum, 78 NY2d at 377).  The party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship," that the communication is predominantly of a legal character, that the communication was confidential and that the privilege was not waived (Rossi v Blue Cross & Blue Shield, 73 NY2d 588, 593-594 [1989]).

The latter two elements -- confidentiality and waiver -- are of primary importance in this appeal.  "Generally, communications made in the presence of third parties, whose presence is known to the [client], are not privileged from disclosure" because they are not deemed confidential (People v Harris, 57 NY2d 335, 343 [1982]; see also Baumann v Steingester, 213 NY 328, 333 [1915]).  Similarly, a client waives the privilege if a communication is made in confidence but subsequently revealed to a third party (see People v Patrick, 182 NY 131, 175 [1905]).  The rationale for these rules is to ensure that the privilege is "strictly confined within the narrowest possible limits consistent with the logic of its principle" (8

John Henry Wigmore, Evidence § 2291 at 554 [McNaughton ed 1961]).
A lack of confidentiality and subsequent disclosure also destroy
the privilege as a matter of fairness: "when [the privilege
holder's] conduct touches a certain point of disclosure, fairness
requires that his privilege shall cease whether he intended that
result or not" (id. § 2327 at 636).

        As with any rule, there are exceptions.  We have held,
for example, that statements made to the agents or employees of
the attorney or client, or through a hired interpreter, retain
their confidential (and therefore, privileged) character, where
the presence of such third parties is deemed necessary to enable
the attorney-client communication and the client has a reasonable
expectation of confidentiality (see People v Osorio, 75 NY2d 80,
84 [1989]).  So, too, when one attorney represents multiple
clients concerning a matter of common interest, any confidential
communications exchanged among them are privileged against the
outside world (see Wallace v Wallace, 216 NY 28, 35 [1915],
citing Hurlburt v Hurlburt, 128 NY 420, 424 [1891]).

                B.   The Common Interest Exception

        This case concerns a related, but distinct, exception
to the general rule that the presence of a third party destroys
any claim of privilege: where two or more clients separately
retain counsel to advise them on matters of common legal

interest, the common interest exception[1] allows them to shield
from disclosure certain attorney-client communications that are
revealed to one another for the purpose of furthering a common
legal interest.  The doctrine has its roots in criminal law and,
as originally conceived, "allowed the attorneys of criminal co-
defendants to share confidential information about defense
strategies without waiving the privilege as against third
parties" (Teleglobe Communications Corp. v BCE, Inc., 493 F3d
345, 364 [3d Cir 2007]).  The first reported case to recognize
the exception permitted criminal attorneys to coordinate the
strategies of their clients, who were under joint indictment for
conspiracy to defraud an estate, and retain the privileged nature
of their communications (see Chahoon v Commonwealth, 62 Va 822,
839-840 [1871]).  The rationale for the exception was that the
parties "had the same defen[s]e to make" and therefore "the
counsel of each was in effect the counsel of all" (id. at 841-
842).

Courts eventually replaced this "joint defense"

---

[1]    The exception has come to be known by many names:
"common interest arrangement," "common legal interest doctrine,"
"joint litigant privilege," "pooled information privilege,"
"allied lawyer doctrine" and "allied litigant privilege," among
others. "The nomenclature is less important than a determination
of the outer boundaries of the doctrine" (North River Ins. Co. v
Columbia Cas. Co., 1995 WL 5792 at *2 [SD NY 1995]).  For
purposes of this appeal, we use the phrase "common interest
doctrine" or "common interest exception," to make clear that the
doctrine is not an independent privilege but an exception to the
general rule that communications shared with third parties are
not privileged.

doctrine, which applied to criminal codefendants, with a broader exception that also protected communications between parties to civil litigation. In Schmitt v Emery (211 Minn 547 [1942]), a privileged document was exchanged among counsel for several codefendants in a civil action, in order to prepare objections to the document's admission into evidence. The Minnesota Supreme Court held that "[w]here an attorney furnishes a copy of a document entrusted to him by his client to an attorney who is engaged in maintaining substantially the same cause on behalf of other parties in the same litigation," the communication is protected from disclosure by the attorney-client privilege because it was "made not for the purpose of allowing unlimited publication and use, but in confidence, for the limited and restricted purpose to assist in asserting their common claims" (id. at 554). The Uniform Rules of Evidence adopted this formulation of the doctrine, protecting attorney-client communications "by the client or a representative of the client or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein" (Uniform R. Evid. 502[b][3] [emphasis added]).[2]

_____

   [2] "This seems to have been the common law rule" (24 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5493 at 467 [1986]), and at least eleven states have statutorily restricted the common interest doctrine to communications made in furtherance of ongoing litigation (see Ark. R. Evid. 502[b][3]; Haw. R. Evid. 503[b][3]; Ky. R. Evid.

Our Court first recognized the common interest doctrine in 1989 in People v Osorio (75 NY2d 80).  In that case, we considered whether a defendant who communicated with counsel in the presence of a separately represented codefendant in a pending criminal prosecution could prevent the codefendant from testifying as to what he heard.  The codefendant was at the time acting as an interpreter between the defendant and his attorney. Although we acknowledged that the attorney-client privilege would, ordinarily, protect communications between codefendants that are shared for the purpose of "mounting a common defense," we ultimately held that it did not apply in that case because the defendant "was not planning a common defense" and therefore did not share a common legal interest with him (id. at 85).  For support, we relied on two federal decisions that applied the common interest doctrine to statements made between codefendants in furtherance of a joint trial strategy or defense: the court in United States v McPartlin held that such communications were privileged because they "were made in confidence to an attorney for a co-defendant for a common purpose related to both defenses" (595 F2d 1321, 1336 [7th Cir 1979]), and the court in Hyundee v United States applied the same reasoning to communications

503[b][3]; Me. R. Evid. 502[b][3]; Miss. R. Evid. 502[b][3]; NH Evid. R. 502[b][3]; N.D. R. Evid. 502[b][3]; 12 Okla. Stat. § 2502[B][3]; S.D. R. Evid. § 19-19-502[a][3]; Tex. R. Evid. 503[b][1][C]; Vt. R. Evid. 502[b][3]; but see D.R.E. 502[b][3] [permitting disclosure to an attorney or client "representing another in a matter of common interest"]).

between the attorneys of persons who were "subject to possible indictment" (355 F2d 183, 185 [9th Cir 1965]).

After Osorio, New York courts applied the common interest doctrine in criminal as well as civil matters, to communications of both coplaintiffs and codefendants, but always in the context of pending or reasonably anticipated litigation. Indeed, until the First Department's decision in this case, New York courts uniformly rejected efforts to expand the common interest doctrine to communications that do not concern pending or reasonably anticipated litigation (see e.g., Hyatt v State of Cal. Franchise Tax Bd., 105 AD3d 186 [2d Dept 2013]; Hudson Val. Mar., Inc. v Town of Cortlandt, 30 AD3d 377, 378 [2d Dept 2006]; Yemini v Goldberg, 12 Misc 3d 1141, 1143 [Sup Ct, Nassau County 2006]; Aetna Cas., 176 Misc 2d at 612-613; see also Allied Irish Banks, P.L.C. v Bank of Am., N.A., 252 FRD 163, 171 [SD NY 2008] [recognizing that New York limits the doctrine "to communications with respect to legal advice 'in pending or reasonably anticipated litigation'"]; 4-160 Bender's New York Evidence § 160.02[6][e][2015] [stating that the common interest doctrine in New York is limited "to communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation in which the joint consulting parties have a common legal interest"]; Wright & Graham § 5493 n 67 [2015 Supp] [observing that the doctrine does not apply in New York where clients did not fear litigation at the time the

communication was made or disclosed]).[3]

### C.   The Present Appeal

The question presently before us is whether to modify the existing requirement that shared communications be in furtherance of a common legal interest in pending or reasonably anticipated litigation in order to remain privileged from disclosure, by expanding the common interest doctrine to protect shared communications in furtherance of any common legal interest.  We adhere to the litigation requirement that has historically existed in New York.

As an exception to the general rule that communications made in the presence of or to a third party are not protected by the attorney-client privilege, our current formulation of the common interest doctrine is limited to situations where the benefit and the necessity of shared communications are at their highest, and the potential for misuse is minimal.  Disclosure is privileged between codefendants, coplaintiffs or persons who

---

[3]  Other jurisdictions have embraced the same limitation through judicial decision (see e.g., In re Santa Fe Intl Corp., 272 F3d 705, 711 [5th Cir 2001] [holding that "there must be a palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation, before communications between one possible future co-defendant and another . . . could qualify for protection"]; O'Boyle v Borough of Longport, 218 NJ 168, 193, 198-199 [2014]; Boyd v Comdata Network, Inc., 88 SW3d 203, 214-215 [Tenn App 2002]; Gallagher v Off. of the Attorney Gen., 141 Md App 644, 676-677 [Ct Special App 2001]; Hicks v Commonwealth of Va., 17 Va App 535, 538 [1994]; Visual Scene, Inc. v Pilkington Bros., Plc., 508 So2d 437, 440 [Fla Dist Ct App 1987]).

reasonably anticipate that they will become colitigants, because such disclosures are deemed necessary to mount a common claim or defense, at a time when parties are most likely to expect discovery requests and their legal interests are sufficiently aligned that "the counsel of each [i]s in effect the counsel of all" (Chahoon, 62 Va at 841-842).  When two or more parties are engaged in or reasonably anticipate litigation in which they share a common legal interest, the threat of mandatory disclosure may chill the parties' exchange of privileged information and therefore thwart any desire to coordinate legal strategy.  In that situation, the common interest doctrine promotes candor that may otherwise have been inhibited.

    The same cannot be said of clients who share a common legal interest in a commercial transaction or other common problem but do not reasonably anticipate litigation.  Bank of America contends that highly regulated financial institutions constantly face a threat of litigation and that the protection of their shared communications is necessary to facilitate better legal representation, ensure compliance with the law and avoid litigation.  But no evidence has been presented here that privileged communication-sharing outside the context of litigation is necessary to achieve those objectives.  There is no evidence, for example, that mergers, licensing agreements and other complex commercial transactions have not occurred in New York because of our State's litigation limitation on the common

interest doctrine; nor is there evidence that corporate clients will cease complying with the law. Rather, "when parties share attorney-client communication for planning purposes outside of the specter of anticipated litigation, such as when parties cooperate to strengthen or obtain patent protection . . . it is more likely that [they] would have shared information even absent the privilege" (Melanie B. Leslie, The Costs of Confidentiality and the Purpose of Privilege, 2000 Wis L Rev 31, 68 [2000]).

The merger at the heart of this dispute provides the perfect example: Bank of America and Countrywide obtained regulatory approval and filed the requisite disclosures in anticipation of a closing merger, even when New York state courts had made clear that their joint communications would not remain privileged unless they were engaged in or anticipated litigation. Put simply, when businesses share a common interest in closing a complex transaction, their shared interest in the transaction's completion is already an adequate incentive for exchanging information necessary to achieve that end. Defendants have not presented any evidence to suggest that a corporate crisis existed in New York over the last twenty years when our courts restricted the common interest doctrine to pending or anticipated litigation, and we doubt that one will occur as a result of our decision today.

In short, we do not perceive a need to extend the common interest doctrine to communications made in the absence of

pending or anticipated litigation, and any benefits that may attend such an expansion of the doctrine are outweighed by the substantial loss of relevant evidence, as well as the potential for abuse. The difficulty of defining "common legal interests" outside the context of litigation could result in the loss of evidence of a wide range of communications between parties who assert common legal interests but who really have only non-legal or exclusively business interests to protect. Even advocates of a more expansive approach admit that "in a nonlitigation setting the danger is greater that the underlying communication will be for a commercial purpose rather than for securing legal advice" (James M. Fischer, The Attorney-Client Privilege Meets the Common Interest Arrangement: Protecting Confidences While Exchanging Information for Mutual Gain, 16 Rev Litig 631, 642 [1997]). At least one commentator has also observed that "[t]he greatest push to expand the common interest privilege comes from corporate attorneys representing multiple clients, often in an antitrust context," and that it is in precisely this context "that the potential for abuse is greatest" (Edna S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 277 [5th ed 2007]).

Indeed, Ambac argues that the very communications Bank of America withheld from disclosure would have revealed that the merging entities structured their transaction to conceal Countrywide's fraudulent dealings and leave potential victims

without recourse.  Defendants and amici respond that there is no
evidence of actual abuse in this case or in jurisdictions that
have done away with a litigation requirement, but the potential
for abuse is sufficiently great, and the accompanying benefits so
few, that expansion is not warranted.

Bank of America's remaining counterarguments do not
persuade us to the contrary.  First, it contends that we should
not limit the common interest doctrine to pending or anticipated
litigation when the attorney-client privilege from which the
doctrine derives is not so limited.  While it is true that the
attorney-client privilege is not tied to the contemplation of
litigation, the common interest doctrine does not need to be co-
extensive with the privilege because the doctrine itself is not
an evidentiary privilege or an independent basis for the
attorney-client privilege (see In re Megan-Racine Assocs, Inc.,
189 BR 562, 573 n 8 [Bankr ND NY 1995] [observing that it is not
necessary for the common interest doctrine to conform exactly
with the purposes of the attorney-client privilege]).  Rather, it
limits the circumstances under which attorneys and clients can
disseminate their communications to third parties without waiving
the privilege, which our courts have reasonably construed to
extend no further than communications related to pending or
reasonably anticipated litigation.[4]

_____

[4] We need not decide in this appeal what it means to share
common legal interests in pending or anticipated litigation.  We
hold only that such litigation must be ongoing or reasonably

Second, Bank of America argues that our holding will create an anomalous result: clients who retain separate attorneys like defendants did here cannot protect their shared communications absent pending litigation but the same communications made in the absence of litigation would be privileged if defendants had simply hired a single attorney to represent them in the merger. In the joint client or co-client setting, however, the clients indisputably share a complete alignment of interests in order for the attorney, ethically, to represent both parties. Accordingly, there is no question that the clients share a common identity and all joint communications will be in furtherance of that joint representation (see Grace M. Giesel, End the Experiment: The Attorney-Client Privilege Should Not Protect Communications in the Allied Lawyer Setting, 95 Marq L Rev 475, 535 [2011-2012]). Not so when clients retain separate attorneys to represent them on a matter of common interest. It is less likely that the positions of separately-represented clients will be aligned such that the attorney for one acts as the attorney for all (see Chahoon, 62 Va at 841-842), and the difficulty of determining whether separately-represented clients share a sufficiently common legal interest becomes even more obtuse outside the context of pending or anticipated litigation. Consequently, although a litigation limitation may not be

anticipated, and the exchanged communication must relate to it, in order for the common interest exception to apply.

necessary in a co-client setting where the fact of joint
representation alone is often enough to establish a congruity of
interests, it serves as a valuable safeguard against separately-
represented parties who seek to shield exchanged communications
from disclosure based on an alleged commonality of legal
interests but who have only commercial or business interests to
protect (see Megan-Racine, 189 BR at 573 [concluding that
"although total identity of interest is not necessary, the
parties asserting the privilege must have a common legal
interest," which "exists where the parties asserting the
privilege were co-parties to litigation or reasonably believed
that they could be made a party to litigation"] [emphasis in
original]).

Finally, Bank of America urges us to follow the lead of
the federal courts that have considered the question and extended
the common interest exception to communications in furtherance of
any common legal interest.  To be sure, the Restatement and some
federal courts of appeals have eliminated the common law
requirement that shared communications relate to pending or
anticipated litigation (see Restatement [Third] of the Law
Governing Lawyers § 76[1] [1997]; Teleglobe, 493 F3d at 364;
United States v BDO Seidman, LLP, 492 F3d 806, 816 [7th Cir
2007]; In re Regents of the Univ. of Calif., 101 F3d 1386, 1390-

1391 [Fed Cir 1996]).[5]  Like Proposed Rule 503(b)(3) of the

Federal Rules of Evidence -- which was proposed in 1972 but never

adopted -- they allow "attorneys representing different clients

with similar legal interests to share information without having

to disclose it to others . . . in civil and criminal litigation,

and even in purely transactional contexts" (Teleglobe, 493 F3d at

364).  In their view, "[a]pplying the common interest doctrine to

the full range of communications otherwise protected by the

attorney-client privilege encourages parties with a shared legal

interest to seek legal assistance in order to meet legal

requirements and to plan their conduct accordingly" (BDO Seidman,

492 F3d at 816 [internal quotations and citation omitted]).

But this expansion of the doctrine has not been

uniformly received (see nn 2,3, supra), and one treatise has

observed that the common interest exception in these

jurisdictions "is spreading like crabgrass to areas the drafters

of the Rejected Rule could have hardly imagined" (Wright & Graham

§ 5493 [2015 Supp]).

We conclude that the policy reasons for keeping a

litigation limitation on the common interest doctrine outweigh

---

[5] Although the Second and Ninth Circuits have made clear
that actual or ongoing litigation is not required, they do not
appear to have expressly decided whether there must be a threat
of litigation in order to invoke the exception (see Schaeffler v
United States, -- F3d --, 2015 WL 6874979 at *4-5 [2d Cir 2015],
citing United States v Schwimmer, 892 F2d 237 [2d Cir 1989];
United States v Zolin, 809 F2d 1411, 1417 [9th Cir 1987], affd in
part and vacated in part on other grounds, 491 US 554 [1989]).

any purported justification for doing away with it, and therefore maintain the narrow construction that New York courts have traditionally applied.[6]  Accordingly, the order of the Appellate Division should be reversed, with costs, the order of Supreme Court reinstated and the certified question answered in the negative.

---

[6] The Legislature is free to consider the alternative arguments articulated by the dissent and to expand the common interest exception as other state legislatures have done (see e.g., D.R.E. 502[b]).

Ambac Assurance Corp., et al. v Countrywide Home Loans Inc., et al.

No. 80

RIVERA, J.(dissenting):

The purpose of the attorney-client privilege is to encourage candid and open communication between client and attorney to promote the public interest "in the observance of law and administration of justice" (Upjohn Co. v United States, 449 US 383, 389 [1981]). The assumption justifying this oldest of common law evidentiary privileges is that it "fosters the open dialogue between lawyer and client that is deemed essential to effective representation" (Spectrum Sys. Intern. Corp. v Chem. Bank, 78 NY2d 371, 377 [1991] [internal citations omitted]). Effective representation furthers the goal of compliance with the law, thus benefitting not only clients but society in general.

Whether this privilege should extend to confidential communications between separately represented parties, in which they have a common legal interest in a transaction, not involving pending or reasonably anticipated litigation, is the question posed in this appeal, and one which I would answer in the affirmative under the circumstances presented here. Given that the attorney-client privilege has no litigation requirement and the reality that clients often seek legal advice specifically to

- 1 -

comply with legal and regulatory mandates and avoid litigation or liability, the privilege should apply to private client-attorney communications exchanged during the course of a transformative business enterprise, in which the parties commit to collaboration and exchange of client information to obtain legal advice aimed at compliance with transaction-related statutory and regulatory mandates.

I.

The attorney-client privilege recognized at common law and codified at Civil Practice Law and Rules § 4503 "protects confidential communications between a lawyer and client related to legal advice sought by the client" (In re Nassau County Grand Jury Subpoena Duces Tecum Dated June 24, 2003, 4 NY3d 665, 678 [2005]; see CPLR 4503). The privilege "encourage[s] full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice" (Upjohn Co., 449 US at 389; Rossi v Blue Cross and Blue Shield of Greater New York, 73 NY2d 588, 592 [1989]; Matter of Jacqueline F., 47 NY2d 215, 218 [1979]). The free flow of information promotes effective representation based on "sound legal advice or advocacy," leading, optimally, to the salutary goal of lawfully compliant behavior (see Upjohn Co., 449 US at 389-390; Spectrum Sys. Intern. Corp., 78 NY2d at 381; United States v Schwimmer, 892 F2d

237, 243 [2d Cir 1989]).  This goal justifies treatment of the

privilege "as an exception to the general requirement that all

persons give testimony upon facts within their personal knowledge

inquired of in a court of law" (Jacqueline F., 47 NY2d at 219).

Notably, the privilege "is not tied to the

contemplation of litigation" (Spectrum Sys. Intern. Corp., 78

NY2d at 380) because litigation may not be the motivating factor

leading to a client's communication of private information.

Rather, "[l]egal advice is often sought, and rendered, precisely

to avoid litigation, or facilitate compliance with the law, or

simply to guide a client's course of conduct" (id.).  All the

more so in the corporate context, where corporate staff attorneys

> "may serve as company officers, with mixed
> business-legal responsibility; whether or not
> officers, their day-to-day involvement in
> their employers' affairs may blur the line
> between legal and nonlegal communications;
> and their advice may originate not in
> response to the client's consultation about a
> particular problem but with them, as part of
> an ongoing permanent relationship with the
> organization"

(Rossi, 73 NY2d at 592-593).

In determining "what is encompassed by the privilege,

courts . . . must look to the common law" (Spectrum Sys. Intern.

Corp., 78 NY2d at 377).  However, our inquiry considers the

circumstances of each case, relevant general principles, and

public policy informing the proper application of the privilege

(Matter of Priest v Hennessy, 51 NY2d 62, 68-69 [1980]; Spectrum

Sys. Intern. Corp., 78 NY2d at 380).  In our analysis, just as we

are cautious not to extend the privilege beyond the bounds of necessity, we also carefully measure waivers of the privilege to protect the parties' reasonable expectations in the privacy of their communications (People v Osario, 75 NY2d 80, 84-85 [1989]).

As the majority well details, third-party communications destroy the privilege (majority op., at 8). This waiver rule is subject to limitations that promote communication and effective legal representation, as well as the parties reasonable expectations in confidentiality (Osario, 75 NY2d at 84-85; see majority op., at 9).

Those same concerns were present in People v Osario, when this Court recognized an exception to the waiver rule in the criminal context -- referred to as the "joint defense exception" -- by which a court treats as privileged any statements disclosed by one defendant in the presence of a codefendant, where the disclosure is for the purpose of mounting a common defense (75 NY2d at 85). The Court concluded that under those circumstances a defendant has an expectation of the continued confidentiality between attorney and defendant (id.).

Not long thereafter New York courts extended the underlying rationale of Osario to civil cases (see Parisi v Leppard, 172 Misc 2d 951, 956 [Sup Ct, New York County 1997]; Aetna Cas. & Sur. Co. v Certain Underwriters at Lloyd's, London, 176 Misc 2d 605, 612-613 [Sup Ct, NY County 1998], affd 263 AD2d 367 [1st Dept 1999], lv dismissed 94 NY2d 875 [2000]). Those

courts generally required pending or reasonably anticipated litigation in order to apply what was often termed a common interest privilege (see e.g. Hyatt v State of Cal. Franchise Tax Bd., 105 AD3d 186, 205 [2d Dept 2013]; Hudson Val. Mar., Inc. v Town of Cortlandt, 30 AD3d 377, 378 [2d Dept 2006]).

However, it is worthy of note that the majority of federal courts that have addressed the issue, and a significant number of state jurisdictions, either through case law or by statute, have held that the privilege applies even if litigation is not pending or reasonably anticipated.[1] Several legal commentators also support a broad application of the privilege. For example, the Restatement (Third) of the Law Governing Lawyers

---

[1] See United States v Zolin, 809 F2d 1411, 1417 (9th Cir 1987) ("Even where the non-party who is privy to the attorney-client communications has never been sued on the matter of common interest and faces no immediate liability, it can still be found to have a common interest with the party seeking to protect the communications."), affd in part, vacated in part on other grounds, 491 US 554 (1989); United States v BDO Seidman, LLP, 492 F3d 806, 816 (7th Cir 2007); In re Teleglobe Communications Corp., 493 F3d 345, 364 (3d Cir 2007); In re Regents of Univ. of California, 101 F3d 1386, 1390-1391 (Fed Cir 1996); Schaeffler v United States, 806 F3d 34, 40 (2d Cir 2015); Hanover Ins. Co. v Rapo & Jepsen Ins. Servs., Inc., 449 Mass 609, 616 (2007) (rejecting a litigation limitation on the common interest doctrine); S.F. Pac. Gold Corp. v United Nuclear Corp., 143 NM 215, 222 (NM Ct App 2007) ("A third party to whom privileged disclosures are made under the common interest doctrine may be a nonparty to any anticipated litigation and may be a legal entity distinct from the client who receives the legal advice"); see also D.R.E. 502 (b) (extending the attorney-client privilege to confidential communications made by the client to a lawyer "representing another in a matter of common interest").

has adopted a rule that applies the attorney-client privilege to disclosures by clients with a common interest in litigated or nonlitigated matters (Restatement [Third] of the Law Governing Lawyers § 76 [2000]).  Similarly, Weinstein's on Evidence explains that the common interest doctrine "should apply not only if litigation is current or imminent but whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference" (3-503 Weinstein's Federal Evidence § 503.21 [2015]).  Indeed, many courts and commentators recognize the important interests served by the free flow of information between parties with a common legal interest, even without the threat of litigation (see BDO Seidman, LLP, 492 F3d at 816; In re Regents of Univ. of California, 101 F3d at 1390-1391).

Given the purpose of the attorney-client privilege to encourage communication essential to the rendition of adequate legal advice, I agree with the majority that we should stamp our imprimatur on a "common interest doctrine" and its application in civil cases (majority op., at 1, 14).  I part company from the majority in its adoption of a pending or reasonably anticipated litigation requirement.  Such requirement does not derive from the common law roots of the attorney-client privilege, which lacks any litigation requirement.  Further, the rule adopted by the majority ignores the unique common legal interests of parties to a merger, and the statutory and regulatory compliance mandates

as motivating factors for client exchanges in these types of commercial transactions.  The better rule is grounded not in the rote application of a litigation requirement, but in the legal dynamics of a modern corporate transactional practice.

## II.

### A.

The legal demands of a highly-regulated financial business environment affect the management of information shared between client and attorney where separately represented parties work collaboratively towards a mutual goal of transforming existing business entities and relationships.  Confidences shared with attorneys under an appropriate common law privilege may further compliance with legal mandates.

Where the government imposes regulatory and legal requirements that invariably, if not specifically, anticipate disclosure of information that is best developed by cooperation among clients, application of the attorney-client privilege strikes an appropriate balance between the benefits of disclosure--ensuring legal advice that advances the creation of accurate and compliant legally mandated information--and the costs to the truth-seeking process of our legal system from barring discovery of certain information.  The privilege should apply where disclosure of client communications facilitates the provision of legal services to advance a joint strategy developed

to ensure compliance with regulatory or other legal mandates for the production of documents, and the framing of legal positions, necessitated by regulatory and legal obligations.  It should apply to nonlitigation transactional matters in which the separately represented parties share a common legal interest in the transfer of liability to a successor, and in furtherance of which the parties exchange information in the presence of a third party to facilitate legal advice on a common strategy for compliance with statutory and regulatory requirements, necessarily accomplished by production of joint representations essential to the transformative enterprise (see Anne King, The Common Interest Doctrine and Disclosures During Negotiations for Substantial Transactions, 74 U Chi L Rev 1411, 1417 [2007]).

          As relevant to this appeal, where parties to a merger agreement have a common legal interest in the successful completion of the merger, the privilege should apply to communications exchanged to comply with legal and regulatory requirements related to consummation of the merger.  This application of the privilege functions as a narrowly crafted exception to third-party waivers in the merger context, and is justified because signatories to a pre-merger agreement are bound with a common interest in completion of the merger.  In such case, the privilege would maximize the quality of disclosure necessary for accurate and competent representation leading to compliance with regulatory and legal mandates.  In other words,

the privilege encourages parties committed to a merger to disclose confidential information to avoid submission of incomplete or noncompliant documents.

### B.

The majority concludes that the common interest doctrine should apply solely to "codefendants, coplaintiffs or persons who reasonably anticipate that they will become colitigants" because for these actors, the threat of litigation "may chill the exchange of privileged information" necessary to "coordinate legal strategy" or "mount a common claim or defense" (majority op., at 14-15). The majority's reasoning for adopting a litigation requirement is doctrinally and pragmatically unpersuasive.

First, the common interest doctrine is grounded in the attorney-client privilege, which has no litigation requirement. Indeed, the majority's underlying premise--that the privilege is necessary to entice parties to share confidential information they would otherwise refuse to divulge--is true for any person who seeks legal advice without the threat of litigation. Yet, this Court has rejected this limitation on the common law and statutory privilege (Spectrum Sys. Intern. Corp., 78 NY2d at 380). The majority responds that the common interest doctrine need not be coextensive with the attorney-client privilege because it is not an evidentiary privilege or an independent basis for the attorney-client privilege (majority op., at 18).

Putting aside that the doctrinal status of the common interest doctrine is contested (see Katharine Traylor Schaffzin, An Uncertain Privilege: Why the Common Interest Doctrine Does Not Work and How Uniformity Can Fix It, 15 BU Pub Int LJ 49, 53 [2005]), the fact is that we are called upon in this case not to create subclassifications for client-attorney communications, but to determine "what is encompassed by the [attorney-client] privilege" (Spectrum Sys. Intern. Corp., 78 NY2d at 377).

Which leads to the second flaw in the majority's analysis, namely its limited view of the attorney-client privilege in a transaction such as a merger.  The majority rejects the application of the privilege in this case as unnecessary because parties to a business deal already have an incentive to share information that will close the transaction. However, the majority fails to identify any distinction between coparties or persons who reasonably anticipate litigation, and parties committed to the completion of a merger.  Both are incentivized to cooperate in order to secure a mutually beneficial outcome -- one a successful litigation outcome, the other a successful commercial outcome.  No rational basis exists to recognize the expectations for maintaining confidences in the former but not the latter.

Furthermore, to the extent the majority attempts to set a bright-line rule, that the common interest doctrine should apply only where parties with a common legal interest share

information in reasonable anticipation of litigation, it ignores the inherent vagueness in the term.  Indeed, whether the parties reasonably anticipated litigation inevitably requires judicial consideration of case-specific facts.

Third, the majority's contention that application of the privilege might lead to misuse is purely speculative (majority op., at 17).  The majority notes the "potential for abuse" of the common interest doctrine in the context of corporate attorneys representing multiple clients (id.).  However, there is certainly as much or more such potential in assertions of the common interest doctrine by those "anticipating" litigation and seeking to shield communications from a potential adversary.  In any event, the majority fails to explain why a party's attempted abuse of the privilege cannot be addressed through our legal system's existing methods for preventing and sanctioning obstruction of proper discovery (see e.g. CPLR 3126 [authorizing court to penalize for refusal to comply with order or to disclose]).

There is also nothing to support the majority's contention that the privilege will sweep too broadly due to the difficulty of differentiating between common legal interests and strictly business interests (id.).  To the contrary, courts realize that while the privilege encourages and protects an open flow of communication, its scope extends only as necessary to achieve its common law and statutory purposes of compliance with

the law and effectuating the orderly administration of justice (see Spectrum Sys. Intern. Corp., 78 NY2d at 380; Rossi, 73 NY2d at 592). As a consequence the privilege is limited to matters of common legal interest, and does not protect from discovery communications exchanged to further commercial or personal interests in the business deal, or efforts to leverage information to enhance a client's financial position. The fact is that courts are fully equipped to take on this challenge and it is what they regularly do in discovery: separate privileged communications from nonprivileged. This is certainly the case in numerous federal and state courts that have adopted a nonlitigation version of the common interest doctrine without disastrous results,[2] and there is no reason to presume New York Courts are any less capable of making these same determinations. Hence, in a corporate merger case, like the one before us, the common interest doctrine applies to communications made in the presence of third parties in order to obtain legal advice on the preparation of a joint proxy statement and federal securities registration, but would not shield from discovery client information shared during negotiations related solely to commercial interests.

Significantly, the common interest doctrine is also

---

[2] See Zolin, 809 F2d 1411 (9th Cir 1987); BDO Seidman, LLP, 492 F3d 806 (7th Cir 2007); In re Teleglobe Communications Corp., 493 F3d 345 (3d Cir 2007); In re Regents of Univ. of California, 101 F3d 1386 (Fed Cir 1996).

circumscribed by two requirements.  First, "the communication
must satisfy the requirements of the attorney-client privilege"
(Schwimmer, 892 F2d at 244 [holding that a "claim resting on the
common interest rule requires" the same showing as "all claims of
privilege arising out of the attorney-client relationship"]).
Second, the communication must "further[] a common legal
interest" -- rather than commercial interest -- of the relevant
parties (Schaeffler v United States, 806 F3d 34, 40-41 [2d Cir
2015]).

        The discovery process in the present case is
instructive.  The challenged communications at issue consist of
366 communications made during the six-month period between the
signing of the pre-merger agreement and the merger.  After Bank
of America withdrew the claim of privilege with respect to 28 of
those communications, a special referee conducted a review to
determine whether the remaining communications were properly
withheld.  Those communications were distilled down to
corresponding documents, and the special referee reviewed a total
of 117 documents to determine whether (1) each qualified for
protection under the attorney-client privilege; and (2) if so,
whether that document was made for the purpose of furthering a
legal interest or strategy common to Bank of America and
Countrywide.  As a result, three of the documents were found not
to qualify for the privilege because no legal advice was given or
requested, and an additional three were determined to contain

both privileged and non-privileged material, requiring redaction. The remaining 110 documents were deemed privileged under the common interest doctrine.  Clearly the process served to ensure that only this very limited universe of documents from a finite period in the transaction, fell squarely within the bounds of the common interest doctrine and were therefore properly withheld.

As an additional layer of protection, the crime-fraud exception to the attorney-client privilege continues to permit discovery of communications "when the advice sought relates 'not to prior wrongdoing, but to future wrongdoing' " (BDO Seidman, LLP, 492 F3d at 818, quoting Zolin, 491 US at 562-563 [internal quotation marks omitted]; see In re New York City Asbestos Litig., 109 AD3d 7, 10-11 [1st Dept 2013] [crime-fraud exception applies to communications made in furtherance of the fraud or crime]).

III.

Here, the privileged communications were made in furtherance of consummating the merger of defendant Countrywide Financial Corporation (Countrywide Financial) and its subsidiaries with defendant Bank of America Corporation's wholly-owned subsidiary, Red Oak Merger Corporation.  Defendant Bank of America is a public holding company regulated by the Bank Holding Company Act (12 USC §§ 1841 et seq.), and its subsidiary, Bank of

America, N.A., is a federally chartered bank, governed by the National Bank Act (12 USC §§ 22 et seq.) and regulated by the Office of the Comptroller of the Currency and the Federal Reserve Board (see 12 USC § 1828).[3]  Countrywide Financial's subsidiary bank was regulated by the Office of Thrift Supervision (see 12 USC §§ 1467 et seq. [Home Owners Loan Act]).[4]  Both Countrywide Financial and Bank of America were public reporting companies and, in anticipation of the merger, were required to satisfy US Securities and Exchange Commission (SEC) regulations, necessitating filing of a proxy statement to stock holders, the SEC's Form 8-K (i.e. to notify investors of the status of the target company's outstanding stock) and Form S-4 (i.e. to register newly issue shares acquired from the target company).

        The documents for which defendants assert the privilege thus fit neatly within the attorney-client privilege as refined by the common interest doctrine.  The defendants' attorneys prepared disclosures required by federal law, including SEC joint proxy statements and a Form S-4 registration statement.

---

[3] The Holding Company Act also requires prior written approval from the Federal Reserve Board to acquire and to merge with another bank holding company (see 12 USC § 1842).

[4] In 2011, Office of Thrift Supervision was transferred to the Office of the Comptroller of the Currency by the Dodd–Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111–203, §§ 1046, 1047[b]; 124 U.S. Stat. 1376, 2017 [2010]), and has ceased to exist (see 12 USC § 5413).

Countrywide was required to obtain the approval of its public shareholders by soliciting proxies, which in turn required it to file a proxy statement.  Bank of America Corporation registered the newly issued Bank of America shares it was using to pay for Countrywide's outstanding shares. Bank of America and Countrywide Financial also prepared preliminary and amended disclosures necessary for this joint proxy/registration statement filing.

Bank of America and Countrywide attorneys provided legal advice regarding notice of the acquisition to Countrywide's subsidiary bank account holders via the filing of a proxy statement, and Bank of America and Countrywide consulted on providing legal advice regarding draft written testimony in preparation for and in response to Federal Reserve hearings. Additionally, Bank of America and Countrywide attorneys communicated regarding analyses of lending and servicing practices to ensure that immediately after the merger's closing, the new mortgage business would comply with all applicable mortgage lending and servicing regulations, including fair-lending laws, consumer-protection laws, foreign registration requirements, and conform to changes in the governing state and federal regulations.  Under these circumstances, the privilege should extend to defendants' pre-merger client communications, exchanged to secure legal advice in furtherance of defendants' common interest in the merger.

IV.

The attorney-client privilege is a long-standing exception to the general rule promoting discovery as part of the truth-finding process, and one tolerated because it serves the individual and societal goals of furthering the proper administration of justice by encouraging the free flow of information essential to legal representation.  It has never been limited to client communications involving pending or anticipated litigation.  Even so, the privilege is deemed waived where a client shares information with a third party, under circumstances that reflect the client's disinterest in the continued protection of the confidences.  However, where parties to a merger seek to comply with legal requirements and agree to treat as confidential any exchanges of information made for purposes of seeking legal and regulatory advice to complete the merger, the parties cannot be assumed to have vitiated the private nature of the information, or to harbor an unreasonable expectation of privacy in these exchanges.  Therefore, extension of the attorney-client privilege to these communications is fully in line with the goals of our common law and the needs of our complex system of commercial regulation.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order of the Appellate Division, First Department, reversed, with costs, order of Supreme Court, New York County, reinstated and certified question answered in the negative.  Opinion by Judge Pigott.  Judges Abdus-Salaam, Stein and Fahey concur.  Judge Rivera dissents in an opinion in which Judge Garcia concurs.  Chief Judge DiFiore took no part.

Decided June 9, 2016